In the Matter of Melvin M. BURTON, Jr., Respondent, a Member of the Bar of the District of Columbia Court of Appeals.

Nos. M–143–82; 83–492.

District of Columbia Court of Appeals.

Argued Dec. 15, 1983.

Decided Jan. 11, 1984.

Samuel McClendon, with whom Thomas H. Henderson, Jr., Bar Counsel, and Fred Grabowsky, Bar Counsel, Washington, D.C., at the time the brief was filed, were on the briefs, for petitioner.

Charles A. Brady, Washington, D.C., for respondent.

Before NEBEKER, FERREN and BELSON, Associate Judges.

## ORDER

PER CURIAM:

In these two disciplinary cases, respondent is charged with commingling and mis-

appropriation of funds held in a fiduciary capacity as a court-appointed trustee, as well as with misrepresentation to the Auditor-Master. The Board on Professional Responsibility has recommended in each case that respondent be disbarred from the practice of law. We conclude that the records support the Board's findings of fact and that respondent violated Disciplinary Rules DR 9–102(A) (now DR 9–103(A)) (failure to deposit funds of client in a separate account) [1] and DR 1–102(A)(4) ("dishonesty, fraud, deceit, or misrepresentation"). We therefore agree with the Board's recommendation of disbarment, as set forth more fully in the Board's Reports and Recommendations appended hereto and incorporated herein by reference.

Accordingly, it is ORDERED that respondent, MELVIN M. BURTON, JR., is disbarred from the practice of law in the District of Columbia. *See In re McClellen,* No. M–51–80 (D.C. March 26, 1981); *In re Burka,* 423 A.2d 181 (D.C.1980) (en banc); *In re Newsome,* No. D–34–79 (D.C. November 21, 1979); *In re Quimby,* 123 U.S.App.D.C. 273, 359 F.2d 257 (1966) (per curiam). This order shall be effective thirty (30) days from the date of this opinion. D.C.Bar R. XI, § 19(3).

## APPENDIX

BOARD ON PROFESSIONAL RESPONSIBILITY DISTRICT OF COLUMBIA COURT OF APPEALS

Bar Docket No. 323–80

IN THE MATTER OF MELVIN M. BURTON, JR., RESPONDENT

*REPORT AND RECOMMENDATION OF BOARD ON PROFESSIONAL RESPONSIBILITY*

This case arises out of improper commingling and misappropriation of certain funds

---

1. DR 9–102 was renumbered DR 9–103 on April 30, 1982, when this court amended the Code of Professional Responsibility with the

"revolving door" rules, now DR 9–101, –102. (*"Revolving Door"*), 445 A.2d 615, 618 (D.C. 1982) (en banc).

received by Respondent in his capacity as a court appointed Trustee. The offense was then highlighted by a false statement made by Respondent to the Auditor-Master in an evidentiary hearing held in connection with an audit of Respondent's Trustee accounts.

The matter has been considered by Hearing Committee Five consisting of George W. Miller, Esq., Walter T. Skallerup, Jr., Esq., and Mrs. Rosemarie Brooks. The Committee has recommended that Respondent be disbarred.

The findings of fact contained in the Hearing Committee's report are supported by clear and convincing evidence and are adopted by this Board. The Board also approves the Committee's conclusion that these findings require that the Respondent be disbarred.

The Board can do no better in its report to the Court than to adopt as its own the substantive portions of the Hearing Committee's report which are set out below:

---

### FACTS

Respondent has practiced law in the District of Columbia for 25 years with no prior discipline assessed against him. On February 9, 1979, pursuant to an order of the Superior Court of the District of Columbia in Civil Action 7965–77 RP (*Wilkens, et al. v. Anderson, et al.*), Respondent was appointed as Trustee to sell Lot 5, Square 397, located at 1535–9th Street, N.W., Washington, D.C. (Bar Ex. 2) On April 9, 1979, the real estate was sold for $18,000 less encumbrances, liens, costs and appropriate adjustments, as provided in the contract of sale dated November 23, 1976. (Bar Ex. 3)

On April 19, 1979, Respondent received $12,777.83 as the first payment from the sale of the real estate. (Respondent's Answer to Specification of Charges, ¶ 3) On April 30, 1979, Respondent opened a trust account at the National Bank of Washington, Number 6–177–34–4 (trust account) in which he deposited the $12,777.83 initial payment. Respondent subsequently deposited in the trust account additional proceeds

from the sale of the real estate in the amounts of $500, $75, $38.61 and $25.98. (Bar Exs. 7–9)

During the period November 14, 1979 through January 14, 1981, Respondent made unauthorized withdrawals of funds from the trust account for his personal and business uses and for purposes not related to the trust, and made deposits from unidentified sources into the account. By making such unauthorized withdrawals and deposits, Respondent caused the trust account to have shortages and overages during the period stated above. Data for the trust account as of the closing dates of the monthly bank account statements are as follows:

| | Actual cash on deposit at National Bank of Washington Account Number: 6–177–34–4 | Amount that should have been on deposit in trust account | Shortage or Overage |
|---|---|---|---|
| *4/30/79 | $12,777.83 | $12,777.83 | 00.00 |
| 5/ 9/79 | 12,777.83 | 12,777.83 | 00.00 |
| 6/11/79 | 12,413.07 | 12,763.07 | $ 350.00 |
| 7/11/79 | 10,768.44 | 11,118.44 | 350.00 |
| 8/ 9/79 | 10,026.80 | 10,376.80 | 350.00 |
| 10/10/79 | 10,101.80 | 10,451.80 | 350.00 |
| 11/ 9/79 | 10,041.80 | 10,451.80 | 410.00 |
| 12/11/79 | 6,541.80 | 10,451.80 | 3,910.00 |
| 1/10/80 | 6,233.25 | 10,451.80 | 4,218.55 |
| 2/11/80 | 5,841.25 | 10,451.80 | 4,610.55 |
| 3/11/80 | 3,941.25 | 10,451.80 | 6,510.55 |
| 4/ 9/80 | 191.30 | 10,495.99 | 10,304.69 |
| 5/ 9/80 | 3,824.82 | 10,560.58 | 6,735.76 |
| 6/10/80 | 1,560.41 | 10,560.58 | 9,000.17 |
| 7/10/80 | 5,757.81 | 10,560.58 | 4,802.77 |
| 8/11/80 | 5,332.81 | 10,560.58 | 5,227.77 |
| 9/10/80 | 3,221.94 | 10,560.58 | 7,338.64 |
| 10/ 9/80 | 9,791.60 | 10,560.58 | 768.98 |
| 11/12/80 | 10,191.60 | 10,560.58 | 368.98 |
| 2/10/81 | 10,611.60 | 10,560.58 | 51.02** |

* indicates initial deposit
** indicates overage

(Bar Exs. 14A–R, 11 at 6)

On April 9, 1980, almost one year after it was established, the trust account contained $191.30, less than 2% of the $10,495.99 for which respondent then was accountable as fiduciary. (Bar Ex. 14K)

During the course of an audit of the Trustee's account, the Auditor-Master noted certain irregularities in the handling of the assets in the trust account. For the purpose of inquiring into the mishandling of estate funds, the Auditor-Master of the Superior Court scheduled a hearing on January 13, 1981. (Bar Ex. 11)

At the hearing before the Auditor-Master, respondent maintained that his actions did not endanger the security of trust assets because he had reserves of cash which were made up in part of revenues derived from his law practice. In order to establish his contentions, respondent on January 13, 1981 testified under oath before the Auditor-Master as follows:

I'm making—I don't even know what I have grossed this year, but just to show you, last year I grossed in excess of $150,-000. That was 1979. I don't know what I grossed this year. (Bar Ex. 10, p. 37)

Schedule C to respondent's Form 1040 (Individual Federal Income Tax Return) for 1979 reported a gross income from his trade or business of $58,073. (Bar Ex. 17)

Respondent acknowledged that his testimony under oath to the Auditor-Master of the Superior Court that his gross income for 1979 was in excess of $150,000 was inaccurate. (Tr. p. 62)

In view of the irregularities in the handling of the trust account, the Auditor-Master recommended that the Court consider the advisability of referring the matter to the Office of Bar Counsel for appropriate action. The Auditor-Master further recommended that the usual trustee fees and commissions not be allowed by the court. (Bar Ex. 11)

The court subsequently reviewed the report of the Auditor-Master and approved the report without a referral to the Office of Bar Counsel. (Bar Ex. 12)

1. Disciplinary Rule 9–102(A) provides in pertinent part:
   DR 9–102 Preserving Identity of Funds and Property of a Client.
   (A) All funds of clients paid to a lawyer or law firm, other than advances for costs and expenses, shall be deposited in one or more identifiable bank accounts maintained in the state in which the law office is situated and no funds belonging to the lawyer or law firm shall be deposited therein....

2. Disciplinary Rule 1–102(A)(4) provides:
   DR 1–102 Misconduct.
   (A) A lawyer shall not:
   *    *    *    *    *    *
   (4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.

## DISCUSSION

Bar Counsel has charged that respondent's unauthorized withdrawal and commingling of trust funds violated Disciplinary Rule 9–102(A).[1] In addition, Bar Counsel has charged that respondent's misstatement to the Auditor-Master of respondent's gross earnings for the tax year 1979 violated Disciplinary Rule 1–102(A)(4).[2]

### I. Respondent's Motion To Dismiss Based on Bar Counsel's Alleged Failure to Present A Prima Facie Case

At the conclusion of Bar Counsel's case, respondent moved that the Hearing Committee dismiss the charges "on the basis that Bar Counsel has not presented a prima facie case...." The Committee declined to dismiss the charges. It directed the respondent to go forward with his case, but reserved decision on the question of the sufficiency of Bar Counsel's proof. (Tr. 24–25)

Respondent has asserted that Bar Counsel did not make out a *prima facie* case because Bar Counsel called no witnesses and relied on exhibits which were irrelevant to the charges against respondent. (Respondent's Post Hearing Brief, pp. 10–12)

The Committee believes that respondent's contention that Bar Counsel failed to establish a *prima facie* case is without merit. Respondent did not contest the authenticity of the exhibits offered by Bar Counsel.[3] The exhibits demonstrated that: 1) the Su-

3. Respondent did object to the admission into evidence of Bar Exhibits 1–18 "as being irrelevant and in violation of the Fifth and Fourteenth Amendments to the Constitution." See "Respondent's Objection To Bar Exhibits," which was received by the Board on Professional Responsibility on January 19, 1982, three days before the January 22, 1982 hearing. At the hearing, respondent reiterated his objections to the admissibility of Bar Exhibits 1–18. The Committee sustained respondent's objection on grounds of relevance to Bar Exhibit 1. The Committee overruled respondent's objections to Bar Exhibits 2–18, and those exhibits were admitted into evidence. (Tr. 12–15; 21–24).

perior Court appointed respondent as trustee to sell realty; 2) respondent received payments for the sale of the realty; 3) respondent deposited the payments in a trust account; 4) respondent made a series of withdrawals from the trust account for personal and business purposes, and 5) respondent deposited money in the account that did not derive from the proceeds of the sale of the realty. Thus, the documentary exhibits offered by Bar Counsel were clearly relevant and, indeed, established that respondent commingled personal funds with the funds he was holding as trustee in the trust account and that respondent used funds from the trust account for purposes unrelated to the purpose for which the trust account was established. Such evidence was sufficient to establish a *prima facie* case of a violation of DR 9–102(A).

Bar Counsel's exhibits also demonstrated that respondent, at a hearing before the Auditor-Master, misstated his gross income for the year 1979. The transcript from the hearing before the Auditor-Master (Bar Ex. 10) showed that respondent stated under oath that in 1979 he grossed in excess of $150,000. Respondent's income tax return for 1979 showed, however, that he grossed approximately $58,000. Thus, the exhibits presented in Bar Counsel's case in chief on this aspect were also both relevant and sufficient to establish a *prima facie* case under DR 1–102(A)(4).

In asserting that the Bar Counsel did not make out a *prima facie* case, respondent relies primarily on *In the Matter of Thorup,* 432 A.2d 1221 (D.C.App.1981), where the court stated that "the burden of proof in attorney disciplinary proceedings is on the proponent." 432 A.2d at 1225 *citing Charlton v. Federal Trade Commission,* 177 U.S. App.D.C. 418, 543 F.2d 903 (1976). *In the Matter of Thorup, supra,* is clearly distinguishable from the instant case. There an attorney was accused of failing to adequately represent his client. The only evidence produced to support that charge was a docket sheet that showed only that the accused attorney had failed to file a motion

to suppress, and that such a motion had subsequently been filed by successor counsel and granted by the trial court. The accused attorney was asked to explain his action, and was unable to do so to the satisfaction of the Hearing Committee. In finding the attorney in violation of the Code of Professional Responsibility, the Hearing Committee found the attorney's records and recollections insufficient, which the Court of Appeals held is "misconduct neither charged nor founded in the Disciplinary Rules." 432 A.2d 1225. The court refused to accept the Board on Professional Responsibility's argument that Bar Counsel had met its burden of proof by the introduction of the docket sheet. The court stated that it had repeatedly rejected "Monday morning quarterbacking" in ineffective assistance of counsel cases, and that a judgmental or tactical error revealed by later events or hindsight does not of itself establish a disciplinary violation. The court also rejected the Hearing Committee's use of the attorney's testimony to modify the charges against him.

As discussed above, the exhibits introduced into evidence by Bar Counsel in the instant case demonstrated much more clearly a *prima facie* case that respondent violated the Code of Professional Responsibility. Moreover, Bar Counsel did not in the instant case rely on one piece of evidence, but rather on a large number of detailed and highly relevant exhibits that reflected respondent's conduct over a period of months.

II. *Respondent's Motion To Dismiss Based upon the Superior Court's Approval of the Auditor-Master's Report*

By order dated March 11, 1981, the Superior Court ratified the Auditor-Master's report dated February 12, 1981. (Bar Ex. 12) The Auditor-Master's report contained a recommendation that the court consider the advisability of referring the matter to the Office of Bar Counsel for appropriate action. (Bar Ex. 11, p. 6) In ratifying the Auditor-Master's report, the court did not refer the matter to Bar Counsel and made no reference to the Auditor-Master's recommendation of referral. Respondent con-

tended in a written "Motion To Dismiss Petition Instituting Formal Disciplinary Proceedings" filed prior to the hearing and orally at the hearing (Tr. 16–18) that the Superior Court considered but did not accept the Auditor-Master's recommendation of referral. Respondent further contended that as the Superior Court has general equity powers in matters pertaining to trustees it appoints, the Superior Court's non-referral of the matter was final and conclusive, and, therefore, the Committee was precluded from determining whether respondent had violated any disciplinary rules. The Committee deferred decision on respondent's motion and requested that the parties brief the issues raised thereby in their post-hearing submissions. (Tr. 19–20)

Bar Counsel now contends that the court's ratification of the Auditor-Master's report actually constitutes a determination that respondent breached his duties as trustee. (Bar Counsel's Post-Hearing Brief, p. 5)

In our view, neither we nor the Board on Professional Responsibility is precluded from reviewing respondent's conduct because the court did not specifically refer the matter to the Office of Bar Counsel. The court, in ratifying the Auditor-Master's report, did not purport to make a determination whether respondent breached his fiduciary duty as trustee. The court's order is silent with regard to whether respondent's conduct warranted a referral to the Office of Bar Counsel, and no inference properly can or should be drawn from that silence. Thus, the court's action in this regard does not preclude this Committee from determining whether respondent's conduct was in violation of the Code of Professional Responsibility. Nor does the court's action

constitute a determination that respondent breached his duties as trustee.

III. *Commingling and Misappropriation of Funds*

Respondent does not dispute that he commingled funds he was holding in a trust account with funds from unidentified sources, and that he used funds from the trust account for personal and business purposes. Respondent maintains, however, that his actions were not in violation of DR 9–102(A), as that rule proscribes a lawyer from commingling funds of a *client* with funds belonging to the lawyer.[4]

The question with which we are presented, therefore, is whether the proscription of DR 9–102(A) applies only to circumstances where a traditional lawyer-client relationship exists. That appears to be a question of first impression in the District of Columbia. In a recent decision, however, the District of Columbia Court of Appeals implied that the Rule 9–102(A) proscription against commingling of funds applies whenever an attorney has a fiduciary obligation. In *In the Matter of Burka*, 423 A.2d 181 (D.C. App.1980) [ (en banc) ], the court applied DR 9–102(A) where the court-appointed successor conservator of the estate of an adult ward made a series of unauthorized withdrawals totalling $41,000 from the estate checking account. The respondent conservator also made deposits in excess of $29,000 from unidentified sources into the estate checking account. After the respondent's removal as conservator the Auditor-Master found him accountable for $37,-390.20, of which $11,661.00 was missing. Respondent subsequently made full restitution to the estate. The court affirmed the finding of the Hearing Committee and the Board on Professional Responsibility that respondent had violated DR 9–102(A) by his

---

**4.** Bar Counsel has proceeded on the theory that "Respondent's misappropriation, conversion, and commingling of trust funds violated Disciplinary Rule 9–102(A)." *See* Bar Counsel's Post-Hearing Brief, p. 4; *compare* Specification of Charges, ¶ 11 ("Respondent's unauthorized withdrawals from the trust account violated DR 9–102(A) because he failed to maintain the trust funds in an account of the type required by that disciplinary rule."). In other cases misappropriation (as distinct from commingling) has apparently been charged under DR 1–102(A)(4). *See, e.g., In the Matter of Burka*, 423 A.2d 181, 183, 186–87 (D.C.App.1980) [ (en banc) ].

failure to keep all moneys from the ward's account deposited at all times in a separate identifiable bank account.[5] In holding that the respondent in *Burka* violated DR 9–102(A), the court implicitly recognized that funds of a fiduciary are encompassed in the definition of client funds. *See also In the Matter of Vogel,* 382 A.2d 275, 279–80 (D.C. App.1978) [(per curiam)] (court adopted findings and recommendations of Disciplinary Board, which, in interpreting DR 1–102(A)(4), rejected notion "that a lawyer's responsibilities where funds of third parties are concerned should be treated differently from a lawyer's responsibilities in dealing with his client's funds").

Other jurisdictions which have considered the question have stated that DR 9–102(A) should be applied when an attorney abuses his or her fiduciary duty, even where a conventional lawyer-client relationship does not exist.

In *Simmons v. State Bar of California,* 70 Cal.2d 361, 450 P.2d 291, 74 Cal.Rptr. 915 (1969) [(per curiam)], the Supreme Court of California upheld the finding of a disciplinary board that an attorney had misappropriated funds.[6] The court noted that it was difficult to determine whether the petitioner received the funds he misappropriated in his capacity as a real estate broker or in his capacity as an attorney. The court stated that even if petitioner was acting as a real estate broker at the time he received the funds, "having accepted the money in trust, [he] would still be held to the same high standard." 450 P.2d at 293 [74 Cal. Rptr. at 917]. The court, quoting *Clark v. State Bar,* 39 Cal.2d 161, 166, 246 P.2d 1, 3 (1952) [(per curiam)] (where an attorney,

acting as guardian of an incompetent's estate, was disciplined for mishandling funds), further stated that "[w]hen an attorney assumes a fiduciary relationship and violates his duty in a manner that would justify disciplinary action if the relationship had been that of attorney and client, he may properly be disciplined for his misconduct." 450 P.2d at 294 [74 Cal.Rptr. at 918].

In *Johnstone v. State Bar,* 64 Cal.2d 153, 410 P.2d 617, 49 Cal.Rptr. 97 (1966) [(per curiam)], an attorney was disciplined under California Rule 9 for willful violation of a trust involving money of a third person not a client of the attorney. The California Supreme Court stated: "When an attorney receives money on behalf of a third party who is not his client, he nevertheless is a fiduciary as to such third party. Thus the funds in his possession are impressed with a trust, and his conversion of such funds is a breach of the trust." 410 P.2d at 618 [49 Cal.Rptr. at 98].

In *State v. Freeman,* 229 Kan. 639, 629 P.2d 716 (1981) [(per curiam)], the Kansas Supreme Court was faced with a case in which an attorney, acting as a trustee, had converted to his own use funds due the trust. The court stated:

> Although Sheila Hoffner [the beneficiary of the trust] was not Freeman's client, respondent's powers were to be used in a fiduciary capacity by the terms of the trust and we find his actions are as reprehensible as if he had been handling the money of a client, to whom he would owe the same fiduciary responsibility.

629 P.2d at 720. *See also In re Draper,* 317 A.2d 106 (Del.1974 [(per curiam)] (court

---

**5.** The court also affirmed the finding of the Committee and the Board that respondent's unauthorized withdrawal of money from the estate account constituted dishonesty and deceit in violation of DR 1–102(A)(4).

**6.** The case was decided under Rule 9 of the California Rules of Professional Conduct, which provided:

> A member of the State Bar shall not commingle the money or other property of a client with his own; and he shall promptly report to the client the receipt by him of all

money and other property belonging to such client. Unless the client otherwise directs in writing, he shall promptly deposit his client's funds in a bank or trust company, authorized to do business in the State of California, in a bank account separate from his own account and clearly designated as "Clients' Funds Account" or "Trust Funds Account" or words of similar import. * * * [Quoted in *Simmons v. State Bar of California, supra,* 450 P.2d at 293 [74 Cal.Rptr. at 917].]

found violation of DR 9–102(A) where lawyer was holding funds as correspondent for another lawyer).

The facts presented to this Committee demonstrate that respondent breached his fiduciary obligation as trustee. Although no conventional attorney-client relationship existed, respondent owed a fiduciary obligation to both the Superior Court, which appointed him as trustee, and the beneficiaries of the trust account. The decisions cited above reflect the view, correctly in our opinion, that DR 9–102(A) should apply whenever an attorney assumes a fiduciary relationship and violates his duty in a manner that would justify disciplinary action if the relationship had been that of attorney and client. Thus, we are persuaded that respondent's conduct in the instant case is within the scope of DR 9–102(A).[7]

In addition, in the instant case respondent's appointment as trustee by the Superior Court was presumably due in some measure to his reputation for integrity and competence. Respondent's conduct is clearly the type of behavior DR 9–102(A) was designed to deter with respect to client funds. Certainly respondent's obligations with respect to funds that came into his hands as a court-appointed trustee should be no less than his obligation with respect to funds of a client. To hold that DR 9–102(A) does not apply in the instant case would make no sense and would, indeed, be inconsistent with the purpose of DR 9–102(A).

Respondent contends that his initial withdrawal of $3,300 from the trust account was inadvertent. In summary, respondent alleges that he asked his secretary to draw a check for $3,300 to pay the obligation of another client while he was out of the office, and his secretary drew the check on the wrong account. He further alleges that once he discovered the breached trust account, he initially considered replacing the funds he had withdrawn, but because of his busy schedule the matter escaped his attention. Subsequently, he decided to treat the account as a general checking account and made numerous deposits to and withdrawals from the account. He contends that his conduct in handling the trust account was appropriate because he personally had cash on hand at home to cover what was supposed to be in the account. (Respondent's Post Hearing Brief, pp. 3–4; Tr. pp. 52–54, 95–97)

Courts have held that it will not suffice to absolve an attorney of a charge of commingling that his "course of practice in this respect [was] the product of ignorance rather than design." *In re Makowski*, 73 N.J. 265, 374 A.2d 458, 461 (1977) [(per curiam)]. Thus, we need make no finding here as to whether respondent's initial breach of the trust account was intentional. We note, however, that on November 14, 1979, respondent's general client trust account (client account), on which respondent claims he intended to draw the $3,300 check, which was then certified, had a balance of only $1,564.14. (Bar Ex. 18) Thus, as Bar Counsel notes, respondent could not have obtained certification for a $3,300 check drawn on that account. (Bar Counsel's Post-Hearing Brief, pp. 12–13)

After discovering the initial breach, respondent failed to replace the money he had withdrawn. Although respondent's self-described hectic schedule conceivably could account for the initial breach and some delay in respondent's discovery of the breach, it does not explain respondent's failure to replace the withdrawn funds once he discovered the breach; nor does it explain or excuse respondent's subsequent conduct with respect to the trust account.

By respondent's own admission, after his discovery of the breach, he began a series of withdrawals from and deposits to the account. Respondent testified before the Auditor-Master that he wrote checks for his office rent and the office rent of his associ-

---

**7.** Our interpretation is further supported by the fact that Canon 11 of the Canons of Professional Ethics of the American Bar Association, an antecedent of DR 9–102, was applicable explicitly to client funds "or other trust property." *See* ABA Canon 11.

ates, for witness fees, for the automobile repair bills of his associates, for refunds of client fees, for his secretary's salary, for his debt to the Internal Revenue Service, for his law clerk's salary, and for other personal and business purposes unrelated to the trust. (Bar Ex. 10 at 16–32) Although respondent consistently deposited money from unidentified sources into the account, there were consistently shortages in the account for an almost 18-month period. (Bar Ex. 14)

We have therefore concluded that respondent's conduct in depositing personal funds and funds from unidentified sources into the trust account constituted a commingling of funds in violation of DR 9–102(A). Respondent's use of trust funds for purposes unrelated to the purpose of the trust constituted misappropriation of funds.[8] Bar Counsel has charged that such misappropriation violated DR 9–102(A). See Specification of Charges, ¶ 11 (quoted in footnote 4, supra ). Respondent appears to contend that DR 9–102(A) extends only to commingling. See Respondent's Post Hearing Brief, pp. 18–19. DR 9–102(A) requires that client funds paid to a lawyer "be deposited in one or more identifiable bank accounts maintained in the state in which the law office is situated ...." Unauthorized withdrawals are inconsistent with the requirement to deposit client funds in an identifiable bank account in the jurisdiction, unless the requirement to "deposit" is to be given only a formal meaning. DR 9–102(A)(2), which is cast in terms of an exception to DR 9–102(A), deals with the circumstances under which funds to which both lawyer and client have a claim may or may not be withdrawn from an account or accounts required by DR 9–102(A). This evidences the intention of the draftsmen to require that a deposit, once made in compli-

ance with DR 9–102(A), be maintained—not only free from commingling but also in the bank—until such time as withdrawal is authorized. Such a construction seems consistent with the purpose of DR 9–102(A), which is to provide against the possible loss of clients' funds. See Greenbaum v. State Bar, 15 Cal.3d 893, 544 P.2d 921, 126 Cal. Rptr. 785 (1976) [ (per curiam) ].[9] Accordingly, we have concluded that DR 9–102(A) was intended to prohibit unauthorized withdrawals of the sort charged here as well as commingling, and we have concluded that respondent violated DR 9–102(A) by making such unauthorized withdrawals as well as by commingling.

The Committee expressly rejects respondent's contention that in making unauthorized withdrawals he violated no ethical proscription because he always "maintained sufficient funds to satisfy the requirement of the trust." (Respondent's Post Hearing Brief, p. 19) First, even if respondent did have sufficient cash on hand to cover the shortages, it would not excuse his breach of the trust or his unauthorized use of trust funds. Moreover, respondent has never demonstrated that he did in fact have access to replacement funds.

Finally, the Committee rejects respondent's claim that his breach of the trust was cured when he reimbursed the trust account. Restitution is not a defense to the charge of having misappropriated trust funds. See In the Matter of Burka, 423 A.2d 181 (D.C.App.1980) [(en banc) ]; In the Matter of Quimby, 123 U.S.App.D.C. 273, 359 F.2d 252 [257] (1966) [ (per curiam) ]; In the Matter of Wilson, 81 N.J. 451, 409 A.2d 1153 (1979).

### IV. Misrepresentation to the Auditor-Master

Bar Counsel contends that respondent's testimony under oath to the Auditor-Master

---

8. Misappropriation has been defined as any unauthorized use by the lawyer of clients' funds entrusted to him, including not only stealing, but also unauthorized temporary use for the lawyer's own purpose, whether or not he derives any personal gain or benefit therefrom.

In the Matter of Wilson, 81 N.J. 451, 409 A.2d 1153, 1155 n. 1 (1979).

9. See also In re Broverman, 40 Ill.2d 302, 239 N.E.2d 816 (1968); Ohio State Bar Association v. Gray, 1 Ohio St.2d 97, 204 N.E.2d 683 (1965) [ (per curiam) ].

that he grossed in excess of $150,000 constituted a misrepresentation in violation of DR 1–102(A)(4). Respondent's tax returns and his testimony before the Committee indicate respondent grossed $58,073 in 1979. Respondent argues that his testimony was inadvertent. He contends that he did not intend to indicate that his gross income exceeded $150,000, and that a review of the transcript will demonstrate that his statement concerning his gross income was taken out of context. (Respondent's Post Hearing Brief, p. 17)

The Committee has carefully reviewed the transcript of respondent's testimony before the Auditor-Master. We conclude that respondent knowingly misrepresented his gross income for 1979. In response to direct questioning as to what respondent did with the $150,000 he claimed to have grossed in 1979, respondent testified that he put some of it into an account, bought stock with some of it, and deposited a portion of it in a personal checking account which he used to pay bills. (Bar Ex. 10 at 37–38) During the course of his testimony before the Auditor-Master, respondent had numerous opportunities to clarify any misunderstanding as to what the $150,000 figure referred to, and he consistently indicated it referred to his gross income.

There is no indication from respondent's testimony before the Auditor-Master that in describing his $150,000 gross income, respondent intended to include "all of the funds that come through my office," including "deferred income that's owed to me that I have not collected. . . ." (Tr. at 62) Respondent, as an experienced attorney, legitimately can be imputed with knowledge of the meaning of the term "gross income." We can only conclude that respondent intentionally misrepresented his gross income for the year 1979 to bolster his claim before the Auditor-Master that he was financially sound. In so doing, respondent violated DR 1–102(A)(4).

## V. *Respondent's Character Witnesses*

The Committee has noted the testimony of the seven character witnesses called by respondent. The character witnesses, who included the Chief of Surgery at [D.C. General Hospital] (Dr. Lee), officials of the District of Columbia Superior Court (Messrs. Rucker and Duckenfield), a former client of respondent (Ms. Goodwine), a member of the District of Columbia Council (Mr. Moore), and members of the District of Columbia Bar (Messrs. Mitchell and O'Donnell), attested to respondent's high moral character, trustworthiness and integrity. They testified that respondent selflessly helped other lawyers establish themselves in the profession by sharing his knowledge and experience and by helping young lawyers financially. Some of the character witnesses also testified that respondent had handled money for them with no resulting improprieties or difficulties.

We have given careful consideration to the testimony of the character witnesses. While we do not dispute the accuracy or veracity of the character witnesses' testimony, the testimony does not serve to contest or refute the essential facts at issue in respect of the charges involving commingling and unauthorized use of trust funds. With regard to the misrepresentation charge, the character witnesses' testimony relates to respondent's reputation for truthfulness, and respondent has testified that his misstatement was inadvertent and not intended to mislead. We have regretfully concluded, however, that the totality of the objective evidence is clear and convincing that respondent knowingly misrepresented his gross income at the hearing before the Auditor-Master in violation of DR 1–102(A)(4).

## VI. *Summary*

For the reasons set forth above, the Committee finds that respondent's misappropriation and commingling of funds he was holding in a trust account as a court-appointed trustee constituted a violation of DR 9–102(A). We expressly reject respondent's contention that DR 9–102(A) should not apply in the instant case because of the absence of a conventional attorney-client relationship. We also conclude that respon-

dent's testimony under oath before the Auditor-Master that his gross income was in excess of $150,000 in 1979 constituted "conduct involving ... misrepresentation" in violation of DR 1–102(A)(4).

### RECOMMENDED SANCTION

Bar Counsel states, "A simple commingling of funds or an isolated instance of misrepresentation probably warrants only a censure or a short suspension. [citation omitted.] Misappropriation of client's funds, though, is an egregious offense generally requiring disbarment." (Bar Counsel's Post-Hearing Brief, p. 15) Respondent contends that "this case does not present the elements of a case where disbarment is warranted," and that in light of the totality of the circumstances and the testimony of the character witnesses, "at most a reprimand would be in order." (Respondent's Post Hearing Brief, pp. 20–21)

Based upon the facts of this case, we have concluded that disbarment is the appropriate sanction. The Committee has reached this conclusion notwithstanding respondent's prior, 25-year record at the Bar. Courts in misappropriation cases have not regarded an attorney's prior record of ethical practice as a circumstance sufficient to permit a lesser sanction than disbarment. *See In the Matter of Burka,* 423 A.2d 181 (D.C.App.1980) [ (en banc) ]; *In the Matter of Moore,* 110 Ariz. 312, 518 P.2d 562 (1974) [ (en banc) ]; *Bar Association of Baltimore City v. Marshall,* 269 Md. 510, 307 A.2d 677 (1973).

*In the Matter of Quimby,* 123 U.S.App. D.C. 273, 359 F.2d 257 (1966) [ (per curiam) ], a case decided by the United States Court of Appeals for the District of Columbia Circuit, is factually similar to the instant case. In *Quimby,* the court approved the disbarment of an attorney for misappropriating funds from the estates of two incompetent war veterans for whom he was the court-appointed conservator. After the Court Auditor noted the defalcation, the attorney returned all the withdrawn money with interest. In his defense, he stated

that he was under terrific mental pressure during the time he misappropriated the funds.

The court rejected the attorney's argument that his long record before the bar demonstrated his action was an "isolated aberration not likely to be repeated." 123 U.S.App.D.C. at 274 [359 F.2d at 258]. The court stated:

The administration of justice under the adversary system rests on the premise that clients and the courts must be able to rely without question on the integrity of attorneys. An act against a client evidencing moral turpitude, even though attributable to some aberration or stress that would warrant the prosecutor in abstaining from criminal prosecution, may nevertheless warrant severe disciplinary action concerning an officer of the court.

When a member of the bar is found to have betrayed his high trust by embezzling funds entrusted to him, disbarment should ordinarily follow as a matter of course. Such misconduct demonstrates absence of the basic qualities for membership in an honorable profession. Only the most stringent of extenuating circumstances would justify a lesser disciplinary action, such as suspension, which implies the likelihood that at some future time the court may again be willing to hold out the embezzler as an officer of the court worthy of clients' trust. The appearance of a tolerant attitude toward known embezzlers would give the public grave cause for concern and undermine public confidence in the integrity of the profession and of the legal system whose functioning depends upon lawyers. [*Id.* at 274 [359 F.2d 257]]

In a more recent decision, *In the Matter of Burka,* 423 A.2d 181 (D.C.App.1980) [ (en banc) ], the District of Columbia Court of Appeals ordered disbarment where an attorney was found to have violated DR 9–102(A) and (B) and DR 1–102(A)(4) and (5) for commingling funds from personal and unidentified sources with funds he was holding as the conservator of an estate and

for making unauthorized withdrawals from the estate checking account.

In *In the Matter of Wilson,* 81 N.J. 451, 409 A.2d 1153 (1979), the Supreme Court of New Jersey explained the rationale behind the admittedly strict sanction of disbarment in misappropriation cases.

> [T]he principal reason for discipline is to preserve the confidence of the public in the integrity and trustworthiness of lawyers in general. This reason for discipline is mentioned in some misappropriation cases and not in others.
>
>     \*     \*     \*     \*     \*     \*
>
> We have no doubt that the bar is as anxious as we are to preserve that trust. Its preservation is essential to public acceptance of reforms that may be proposed by the bench and bar together. Mistrust may provoke destructive change. Public confidence is the only foundation that will support constructive reform in the public interest while preserving the finest traditions of the profession.
>
> From that point of view, anything less than strict discipline in cases like this would be a disservice to the bar, the judiciary and the public.

409 A.2d at 1155. *See also In re Smock,* 86 N.J. 426, 432 A.2d 34 (1981) [ (per curiam) ].

In *Bar Association [of Baltimore City] v. Marshall,* 269 Md. 510, 307 A.2d 677 (1973), the court approved disbarment where an attorney misappropriated a client's funds. The court noted that the attorney-client relationship is based on trust and that it is important to both lawyers and society that there be no lessening of the public's confidence in the integrity, honesty and fidelity of the legal profession. The court further noted that "misappropriation by an attorney of funds of others entrusted to his care . . . represents the greatest form of professional misconduct." 307 A.2d at 682. The court concluded by stating:

> [W]hen a member of the bar of this Court is found to have betrayed the high trust in him by appropriating to his own use funds of others entrusted to him, as Marshall did, then, absent the most extenuat-

ing circumstances, which we do not find to be present here, disbarment should follow as a matter of course. [*Id.*]

*See also In the Matter of Moore,* 110 Ariz., 312, 518 P.2d 562 (1974) [ (en banc) ] (disbarment ordered where attorney withdrew client funds for personal use without approval or authorization); *State v. Barrett,* 207 Kan. 178, 483 P.2d 1106 (1971) [ (per curiam) ] (commingling, failure to fulfill trust obligations and false statement held to warrant disbarment).

Respondent's conduct—particularly misappropriating funds entrusted to him at the order of the Superior Court and misrepresenting gross income in testimony under oath before the Auditor-Master—constituted egregious breaches of his professional responsibilities. In light of the authorities cited above and Respondent's conduct as found herein, the Committee recommends that Respondent be disbarred.

(End of quoted portion of Hearing Committee's Report)

---

## CONCLUSION

Sanctions imposed in commingling cases have varied from censure by the Court (*In re Artis,* DCCA No. M–103–81, decided February 25, 1982) to disbarment (*In re Burka, supra*). This Board has had occasion to pass upon five separate cases involving commingling of funds within the last few months (including this one) and all of them are now pending, or will forthwith be pending for review by the Court of Appeals.

As we pointed out in one of these cases (*In re Hines,* Nos. 194–80 and 447–79, decided November 10, 1982) commingling cases fall into a number of patterns. There is the case of an attorney commingling a client's funds in a bank account with his own money when the account is always adequate to cover the escrow. This is a violation of DR 9–102(A), but the client's money is never in jeopardy. There are also many variations of situations in which the client's and personal funds are commingled and the bank

account is allowed to dip below the amount required to satisfy the escrow. At times the evidence seems to indicate only simple negligence on the part of the attorney. In other cases, the evidence indicates deliberate misappropriation of the client's money by the attorney, in violation of [DR 1–102(A)(4)]. At times the commingling is also accompanied by false and misleading statements from the attorney to the client. In the case at bar false and misleading statements were made to the Auditor-Master.

*In the Matter of Harrison,* decided July 20, 1982, the Board found, as in *Hines,* commingling and misappropriation due to sloppiness and recklessness in the handling of the client's funds, together with a lack of candor in dealing with the client. There we have recommended suspension for a year and a day.[1]

*In the Matter of Cefaratti,* decided November 5, 1982, the attorney had limited authority to invest his client's escrowed funds. He "invested" some of them by lending the funds to himself at a rate of interest below that normally charged, without any documentary evidence to support the loan and without the consent of the client. In that case we have also recommended sanction of a year and a day.[2]

In *Hines, supra,* we found that Respondent's conduct involved more than simple negligence but did not rise to the level of corruption. There Respondent showed a reckless disregard of the state of the bank account into which he deposited his client's funds and kept no running balance of this account, which at times was insufficient to cover the client's escrow. We concluded there that this reckless conduct gave rise to a presumption that there was an intent on Respondent's part to deal with and use the escrow funds as his own, and recommended in that case a sanction of two years.

[1. This court adopted the Board's recommendation. *In re Harrison,* 461 A.2d 1034 (D.C. 1983).]

[2. The recommendation was adopted. *In re Cefaratti,* No. M–140–82, June 28, 1983.]

*In the Matter of McLean,* also decided today, the attorney had been engaged in a long-time pattern of commingling clients' funds, which were chiefly those received in settlement of negligence or workmen's compensation cases. The commingled funds were used for business and personal purposes, and the balance in the account was often insufficient to protect the clients. The commingling was accompanied by dishonesty and deceit in dealing with clients. The attorney falsely stated to the clients from time to time that settlement monies had not been received when in fact they had. The attorney was also found to have falsified records submitted to Bar Counsel. Here we have recommended disbarment.[3]

In the instant case, as in *McLean,* we recommend that Respondent be disbarred. Not only was there gross commingling of trust funds over a substantial period of time with periodic extreme shortages in the account, but Respondent was guilty of inexcusable falsehood in testifying before the Auditor-Master who was auditing Respondent's account. The cases of *Quimby* and *Burka, supra,* cited by the Hearing Committee support our conclusion.

BOARD ON PROFESSIONAL RESPONSIBILITY

By /s/ Edmund D. Campbell
EDMUND D. CAMPBELL

All members of the Board concur.

Dated: November 29, 1982

## BOARD ON PROFESSIONAL RESPONSIBILITY DISTRICT OF COLUMBIA COURT OF APPEALS

Bar Docket Nos.: 224–79, 245–81

IN THE MATTER OF MELVIN M. BURTON, JR.

*REPORT AND RECOMMENDATION*

This matter is before the Board based upon the Report and Recommendation of

[3. The recommendation was adopted. *In re McLean,* No. M–142–82, April 11, 1983.]

Hearing Committee Number Two, dated January 24, 1983, which concluded that Respondent had violated Disciplinary Rules 9–103 (commingling client and attorney funds) and 1–102(A)(4) (conduct involving dishonesty, fraud, deceit or misrepresentation) by deliberately misappropriating certain funds which Respondent was holding for others in his "trust account." [1] The hearing committee recommended that Respondent should be suspended from the practice of law for four years based upon these violations. As discussed in sections I and II, below, we agree that Respondent is guilty of knowing misappropriation of funds, in violation of the disciplinary rules charged. For the reasons set forth in section III, below, we reject the various procedural arguments raised by Respondent. Finally, as discussed in section IV, we conclude that the facts of this case and the applicable law require that Respondent should be disbarred.

I. *Facts*

Respondent was retained by the Veterans' Administration ("VA") to institute foreclosure proceedings based upon the default by a Mr. and Mrs. Pailin on a VA loan secured by a real estate deed of trust. The property was sold at a foreclosure sale in June 1978 for $28,000. Bar Counsel's evidence established that Respondent was retained to handle the foreclosure sale, to remand to the VA the amount owing to it on the outstanding loan (approximately $17,000), and to pay the excess to the Pailins after deducting Respondent's fees and any other legitimate expenses associated with the foreclosure sale. *See* Tr. 26–39.

In order to support his charge that Respondent had misappropriated funds, Bar Counsel relied primarily on certain bank records which were introduced into evidence before the hearing committee. The committee reviewed those records in detail and made the following findings:

Those records disclose that Respondent received a check from the settlement company, District Realty Title Insurance Corporation, in the amount of $26,378.16 as the net proceeds of the foreclosure sale [BX 7]. Thereafter, on July 16, 1978, Respondent deposited the check (less a deduction of $1,505.90 not here in question) into a "trust account" bearing the number 3–045–80–3 at the National Bank of Washington [BX 9b]. After allowing for other expenses not here in question, Respondent expressly acknowledged that he was accountable to the Veterans' Administration for $16,639.68 and to the Pailins for $7,256.10 [BX 13], or an aggregate amount of $23,895.78.

On July 18, 1978, Respondent wrote a check, number 3856, on the trust account for $1,000 [BX 9]. This check was made payable to a third party, neither the VA nor the Pailins, and the check caused the remaining balance in the trust account to be reduced to $23,744.11, which was a sum less than the total amount payable to the VA and the Pailins [BX 9 and 9w]. Thereafter, Respondent made other withdrawals from the trust account, by means of checks payable neither to the VA nor the Pailins, so that on July 26, 1978, the remaining balance in the trust account was $19,969.66 [BX 9 through 9gg].

Thereafter, on July 27, 1978, Respondent paid the Veterans' Administration $16,639.68 [BX 12], which represented the full amount due to the VA on the mortgage. This payment was made by a check bearing the number 3863, written on the above trust account, whereupon the remaining balance in the trust account at the National Bank of Washington was $2,929.28 [BX 10]. Yet, according to Respondent's own accounting,

---

1. The hearing committee concluded that the separate charges in Count II of Bar Counsel's petition, arising out of an unrelated set of facts, were not supported by clear and convincing evidence and should be dismissed. The hearing committee's findings of fact on those separate charges are supported by substantial evidence on the record as a whole, and we dismiss the charges in Count II for the reasons set forth in the hearing committee's opinion.

Respondent was then accountable to the Pailins for $7,256.10 [BX 13].

Moreover, by late November 1978, numerous other withdrawals reduced the balance in the trust account to $10.10 [BX 11c]. At that time, Respondent was still accountable to both Mr. and Mrs. Pailin for $7,256.10 [BX 13].

In November 1979, Ms. Pailin was paid her share of the proceeds, in the amount of $3,628.05 [BX 13]. This payment was made by Respondent by means of a check drawn on a different bank account, not the trust account number 3–045–80–3 at the National Bank of Washington. There is no evidence in the record that Mr. Pailin has ever been paid his share of the proceeds.

The Committee finds that the financial records subpoenaed from the bank are clear and convincing evidence of the following: (1) that the full amount of the proceeds from the foreclosure sale was deposited into a particular trust account in the National Bank of Washington; (2) that a check of July 18, 1978 for $1,000 reduced the balance in the trust account to an amount less than the total amount then payable to the VA and the Pailins; (3) that the VA was paid in full on July 27, 1978, leaving the trust account with a balance inadequate to cover the amount payable to the Pailins; and (4) that Respondent, by means of numerous other withdrawals from that account, reduced the net balance in the trust account to an amount far below the amount that was due and payable to the Pailins.

The Committee concludes, on the basis of these bank records, that Respondent misused or misappropriated funds which Respondent was holding in trust. Moreover, in light of the numerous checks written on the trust account, which at one point reduced the account to a balance of $10.10 [BX 9, 11, 11a, 11b, 11c, and 11d] when the amount payable from the account was over $23,000, there is no basis for concluding that Respondent's conduct was inadvertent or due merely to "sloppy" administration.

## II. *Discussion*

During the hearing committee proceedings, Respondent presented no evidence tending to contradict the factual findings set forth above. Respondent did not call any witnesses or introduce any exhibits on these issues. Respondent did call a number of "character witnesses" who testified regarding Respondent's reputation, accomplishments, and standing at the Bar. When Bar Counsel attempted to call Respondent as a witness in Bar Counsel's case, Respondent invoked his Fifth Amendment privilege against self-incrimination. *See* Tr. 40–43. Respondent's principal objection argued before this Board [2] is that Bar Counsel failed to prove his case by clear and convincing evidence, leaving many questions unanswered, and effectively shifted the burden to Respondent to prove his innocence. There is no basis for Respondent's arguments.

As indicated above, the Hearing Committee concluded that Bar Counsel did prove by clear and convincing evidence that Respondent placed a sum of money in his client's trust account and failed to maintain that money in the account for payment to the intended beneficiaries. Bar Counsel introduced into evidence bank records demonstrating that approximately thirty separate checks were written by Respondent against this account during the period in question, and that this resulted in the account balance dipping as low as $10.10, at a time when Respondent was obligated to be maintaining thousands of dollars in that account for the benefit of others. *See* Bar Exhibits 9–11d, 13. There certainly was "substantial evidence on the record as a whole" to support the hearing committee's factual find-

2. Respondent and Bar Counsel each submitted briefs to this Board but waived any right to present oral argument.

ings, and we accordingly affirm them. *See In re Smith,* 403 A.2d 296, 302 (D.C.1979).

The evidence presented to the hearing committee clearly made out a *prima facie* case of commingling and misappropriation. While it is true, as Respondent argues, that Bar Counsel failed to offer proof concerning precisely how Respondent spent the money he was obligated to hold in the trust account,[3] such information, though potentially relevant, is hardly a necessary predicate to a misappropriation charge. *See Attorney Grievance Commission v. Boehm,* 293 Md. 476, 479–81 [446 A.2d 52, 54] (1982) (Where attorney places auction sale proceeds into escrow account, and bank records reflect withdrawals for unspecified purposes in greater amount than total of proper estate disbursements, court "cannot conceive of any clearer or more convincing evidence of [attorneys] misappropriation of . . . funds than that supplied by the escrow account, bank records, and [the attorney's] failure to explain exactly how these funds were used.")

Respondent's brief to this Board argues heatedly that the hearing committee erred in concluding that there was a knowing misappropriation of funds, because there was no evidence that Respondent knew *in 1978* how much money he was required to hold for distribution to the VA and to the Pailins. Respondent emphasizes that the statement of account which he prepared, and which was relied upon by the hearing committee, was written in 1979, and Respondent emphasizes that in 1978 it was not possible to know with precision the amount of fees and expenses that would be incurred

in the matter. This argument is far wide of the mark.

Respondent's 1979 statement of account, Bar Exhibit 13, makes clear that the fees and expenses in connection with this matter equally approximately $2,500, and that the balance due to the Pailins, after subtracting such expenses and the share paid to the VA, was over $7,000. While it is true that in 1978 Respondent might not have been able to predict precisely the total expenses and fees to be incurred, that is irrelevant to this case as a matter of law. Respondent was obligated to maintain in the trust account any funds that had not yet been properly disbursed; any uncertainty as to future expenses would be legally irrelevant to Respondent's duty to maintain the funds in the account until and unless such expenses in fact were incurred. Bar Exhibit 13 represents Respondent's own admission that only $2,500 in expenses were ever incurred, and thus Respondent cannot now argue that a greater amount of expenses was properly disbursed from the account in 1978. Moreover, Respondent's argument (unsupported by any evidence in the record) that the lack of certainty regarding future fees and expenses might explain Respondent's allowing the balance of his account to fall to $10.10 (when more than $7,000 was due and owing) is totally lacking in credibility.

The hearing committee in this case appropriately allowed Respondent to exercise his Fifth Amendment right not to testify,[4] and the committee made it clear that it was drawing no "adverse inference based on Respondent's failure to testify . . . [or his] invoking his Fifth Amendment privilege

---

**3.** Many of Respondent's checks, which were offered into evidence, were either illegible or were written to payees unknown to Bar Counsel and to the representative of the Veterans Administration who testified. Respondent did not present to the hearing committee any evidence or arguments concerning the nature of these checks he wrote against his trust account.

**4.** The Fifth Amendment privilege is not available as a shield solely against Bar disciplinary proceedings, but can be invoked where testimo-

ny in such proceedings might lead to criminal prosecution. *See In re Thorup* [461 A.2d 1018 at 1019–20], No. M–48–80 slip op. at 2 (D.C. February 25, 1983); *In re Anonymous,* Bar Docket No. 48–81, slip op. at 6–10 (Bd.Prof. Resp., Nov. 3, 1981), and cases cited therein. The hearing committee appropriately credited Respondent's counsel's representation that such consequences could flow from testimony concerning the matters at issue here. *See* Tr. 40–43.

against self-incrimination when Respondent was called as a witness by Bar Counsel." *See* Hearing Committee Report at p. 13. There is simply no basis for Respondent's arguments that the hearing committee effectively placed the burden of proof on him in this matter. Once Bar Counsel had presented a *prima facie* case, Respondent was free to present any evidence or arguments he wished. While Respondent was not obligated to present any defense, neither was Bar Counsel obligated—as Respondent now suggests—to rebut all conceivable defenses and arguments that Respondent theoretically might have made, but in fact did not present, to the hearing committee.

Thus, Respondent essentially argues that Bar Counsel should have proven that Respondent did not have available to him certain defenses and arguments in mitigation that have proven significant to the Board in prior commingling cases. *See, e.g. In re Harrison,* Bar Docket No. 262–79, slip op. at 20 (Bd. on Prof. Resp., July 20, 1982), [*aff'd,* 461 A.2d 1034 (D.C.1983) ]; *In re Hines,* Bar Docket Nos. 194–80 and 447–79, slip op. at 3 (Bd. on Prof. Resp. October 28, 1982). The fact is, however, that Bar Counsel did prove commingling and misappropriation and that Respondent failed to present any evidence whatever of any defense or matter in mitigation regarding this offense. We hold that invocation of the Fifth Amendment does not allow a respondent to place the burden of proof on Bar Counsel to [disprove] affirmative defenses which respondent does not raise.

### III. *Respondent's Motions and Legal Objections.*

Respondent presented to the hearing committee a large number of motions and objections to hearing committee procedures and rulings. The Board affirms the hearing committee's rulings on these matters, which were set forth in its Pre-Hearing Order Number One, dated October 20, 1982,

and in the Hearing Committee's January 24, 1983, Report and Recommendation. We adopt and incorporate herein the hearing committee's rulings on these points, and will merely add a few words on some of the issues that Respondent presses before us.

First, Respondent argues at length that Bar Counsel's subpoena for Respondent's bank records failed to comply with the procedural requirements of the Right to Financial Privacy Act, 12 U.S.C. §§ 3401–3422, as interpreted in a July 8, 1982, District Court decision in *John Doe v. Board on Professional Responsibility,* D.D.C., C.A. No. 81–2683 [July 8, 1982]. We agree with the hearing committee's holding that there is no basis for an "exclusionary rule" prohibiting the introduction into evidence of these bank records, even assuming *arguendo* that Bar Counsel had failed to comply with applicable procedural requirements of the Act. We must emphasize, however, that the District Court decision in question was vacated upon reconsideration on February 3, 1983, and the District Court's most recent decision on this point holds that the District of Columbia Court of Appeals and its Board on Professional Responsibility are not agencies of the federal government subject to the terms of the Right to Financial Privacy Act.[1]

Second, Respondent argues that he was deprived of due process by the hearing committee's refusal to allow a "voir dire" of the hearing committee members before Respondent decided whether to seek recusal of any hearing committee members pursuant to Chapter VIII, Section 3(1)(c) of the Internal Rules of this Board. There is no general right to a "voir dire" of hearing committee members—who serve this Board, and the Court of Appeals, in a quasi-judicial capacity—any more than there is any such right before a party files a motion to recuse a trial judge about to hear his or her case. Moreover, when the hearing committee

---

[1. The district court's February 3 decision vacating the order of July 8, 1982, was affirmed on the issue of the Right to Financial Privacy Act. *Doe v. Board on Professional Responsibil-* *ity of the D.C. Court of Appeals,* 230 U.S.App. D.C. 367, 717 F.2d 1424, 1427 (1983) (per curiam) ].

chairman asked Respondent what issues or questions he would raise in a voir dire, if allowed to conduct one, the matters set forth by Respondent made it clear that he had no particular factual basis for a challenge to any hearing committee member or for a voir dire on any specific area of inquiry. *See* Tr. 3–4.

Third, Respondent argues to this Board that he was deprived of due process because Bar Counsel submitted certain proposed documentary exhibits to the hearing committee in advance of the hearing. Respondent neglects to note that the procedural rule in question allows both Bar Counsel *and* Respondent to submit their documentary evidence to the hearing committee in advance of the hearing date. *See* Chapter VIII, Section 1(4), Internal Rules of the Board on Professional Responsibility. The purpose of this rule, of course, is to allow the parties to exchange exhibits in advance of the hearing so as to determine whether there are any objections as to admissibility of particular exhibits, and also to allow the hearing committee members to begin reviewing the frequently voluminous record in advance of the hearing date. This procedure is quite similar to the practice in many courts which require the submission of pretrial briefs and proposed exhibits in advance of the trial so as to expedite proceedings. Respondent's constitutional challenge to the Board rule allowing advance submission of proposed exhibits is frivolous.

Finally, Respondent argues that the charges at issue here should be dismissed because the petition in this matter was the result of Bar Counsel's improperly "reopening" a matter which had previously been the subject of inquiry. The record in this matter reveals that Docket No. 224–79 was initially based upon a rather vague, handwritten complaint filed by Ms. Loreta Pailin. Respondent answered this complaint on December 15, 1979, and the complainant failed to respond to the explanation furnished by Mr. Burton. Nothing in the complaint or in Mr. Burton's response suggested any commingling of funds, and Bar Counsel

on February 1, 1980, dismissed Ms. Pailin's complaint. However, on March 1, 1982, Bar Counsel wrote to Mr. Burton and indicated that he was "reopening" this investigation, because "recent information concerning this case indicates that you misappropriated and converted the funds you were holding in your client trust account on behalf of Mr. Nathaniel Pailin and Ms. Loreta Pailin." Respondent was offered an opportunity to answer this additional charge, and subsequently Bar Counsel filed the formal petition leading to these proceedings. Under Court rules Bar Counsel is obligated to investigate allegations of unethical conduct which come to his attention, via complaint or otherwise. Rule XI, § 6(1)(b), D.C.App. Rules. Consequently, Bar Counsel was free unilaterally to open a new investigation of Respondent based upon new information suggesting commingling. Simply because Bar Counsel chose to term this a "reopening" of a previously docketed and closed case does not result in any prejudice to Respondent. Bar Counsel's "closing" of an investigation without filing a formal petition or initiating hearings of any kind hardly constitutes an action to which the doctrine of *res judicata* may be applied, nor does it provide a basis for Respondent's argument that he can never be charged with disciplinary violations which could have been, but were not, spelled out in a citizen's complaint.

## IV. *Sanction*

An attorney's misappropriation of funds entrusted to him is widely recognized as one of the most serious forms of professional misconduct. *Attorney Grievance Commission v. Pattison,* [292 Md. 599,] 441 A.2d 328 (Md.1982); *Office of Disciplinary Counsel v. Lewis,* [493 Pa. 519,] 426 A.2d 1138 (Pa. 1981); *In re Davis,* [129 Ariz. 1,] 628 P.2d 38 (Ariz.1981) [(en banc)]; *Florida Bar v. Merritt,* 394 So.2d 1018 (Fla.1981) [(per curiam)]. It strikes at the heart of the relationship of trust and confidence that is so necessary between attorney and client, and it reveals a lack of the integrity which is a fundamental requirement in order to be

qualified to practice law. *See generally In re Quimby,* [123 U.S.App.D.C. 273, 274,] 359 F.2d 257, 258 (D.C.Cir.1966) [ (per curiam) ]:

The administration of justice under the adversary system rests on the premise that clients and the courts must be able to rely without question on the integrity of attorneys. An act against a client evidencing moral turpitude, even though attributable to some aberration or stress that would warrant the prosecutor in abstaining from criminal prosecution, may nevertheless warrant severe disciplinary action concerning an officer of the court.

When a member of the bar is found to have betrayed his high trust by embezzling funds entrusted to him, disbarment should ordinarily follow as a matter of course. Such misconduct demonstrates absence of the basic qualities for membership in an honorable profession. Only the most stringent of extenuating circumstances would justify a lesser disciplinary action, such as suspension, which implies the likelihood that at some future time the court may again be willing to hold out the embezzler as an officer of the court worthy of clients' trust. The appearance of a tolerant attitude toward known embezzlers would give the public confidence in the integrity of the profession and of the legal system whose functioning depends upon lawyers.

Thus, a review of the cases demonstrates that disbarment is the normal sanction for commingling that involves knowing misappropriation of funds. *In re McClellen,* No. M–51–80 (D.C. March 26, 1981); *In re Burka,* 423 A.2d 181 (D.C.1980) [ (en banc) ]; *In re Newsome,* No. D–34–79 (D.C. November 21, 1979).

While this Board has held that a lesser sanction might be appropriate if Respondent demonstrates that the misappropriation was inadvertent (*e.g.,* due to sloppy bookkeeping practices rather than an intention to convert client funds. *See In re Hines, supra; In re Harrison, supra* ) there is no basis in this record to conclude that any such factors in mitigation exist. *See* pp. 832–834, *supra.* Thus, we conclude that the findings in this case of commingling and knowing misappropriation, absent any mitigating factors,[5] require Respondent's disbarment.

Our conclusion on this point would be the same even if Respondent had no prior disciplinary record. *See generally In re Burka,* 423 A.2d 181 (D.C.1980) [ (en banc) ]. However, our view is buttressed by the fact (not available to the hearing committee at the time of its decision (that Respondent recently has been found by this Board to have been guilty of misappropriation of client funds in another matter. In *In re Burton,* Bar Docket No. 323–80 (Bd. Prof. Resp. November 29, 1982), this Board found that Respondent misappropriated for his own personal and business use more than $10,000 in funds that he was holding as a court-appointed trustee,[6] and that Respondent made a false statement under oath to the Auditor-Master in connection with an investigation of that matter. We recommended to the Court of Appeals that Mr. Burton should be disbarred for those offenses, and that recommendation is currently pending before the Court.

Since we now find that Respondent has committed yet another misappropriation of funds entrusted to him, we believe that the public interest in preserving the integrity of

---

5. Respondent presented substantial "character testimony" demonstrating his professional accomplishments, reputation and standing at the Bar. While such testimony is of course entitled to weight in considering disciplinary sanctions generally, we believe that where the facts demonstrate *knowing* misappropriation of funds, no amount of character testimony or proof of a prior unblemished record at the Bar will normally call for a departure from the sanction of disbarment for such an egregious offense. *See*

generally *In re Burka,* 423 A.2d 181 (D.C.1980) [ (en banc) ] (disbarment ordered for misappropriation where Respondent had no prior disciplinary record and where extensive evidence was submitted to the Board regarding Respondent's achievements and good character).

6. The trust account at issue in that case was not the same account as that involved here.

the Bar requires that we recommend once again that Respondent be disbarred.

BOARD ON PROFESSIONAL RESPONSIBILITY

By /s/ Allen R. Snyder
     ALLEN R. SNYDER
     Chairman

April 26, 1983

Date

All members of the Board except Mr. Wilson participated in the consideration and decision of the matter.