**In re W. Edward THOMPSON, Respondent, A Member of the Bar of the District of Columbia Court of Appeals.**

No. 89–952.

District of Columbia Court of Appeals.

Argued April 5, 1990.

Decided Aug. 14, 1990.

James T. Maloney, Washington, D.C., for respondent.

Ross T. Dicker, Asst. Bar Counsel, with whom Thomas E. Flynn, Washington, D.C., Bar Counsel, was on the brief, for Bar Counsel.

Before FERREN and FARRELL, Associate Judges, and MACK, Senior Judge.

FARRELL, Associate Judge:

In this disciplinary proceeding, the primary charge brought against respondent by Bar Counsel, and found to have been established by both a Hearing Committee and the Board on Professional Responsibility (the Board), is that respondent engaged in dishonest misappropriation of a client's funds in violation of DR 1–102(A)(4).[1] The principal issue before us is how much weight properly may be given to an attorney's failure to come forward with a satisfactory explanation for the use of client funds when it has been shown by clear and convincing evidence that the attorney took the funds without prior authorization for a non-*de minimis* period of time and kept no records of their use.

We sustain the Board's conclusion that respondent's failure credibly to explain his

---

1. DR 1–102(A)(4) provides that a lawyer shall not: "Engage in conduct involving dishonesty, fraud, deceit or misrepresentation."

use of a client's funds, when combined with the evidence of misappropriation established by Bar Counsel, supports a finding of dishonest misappropriation under DR 1–102(A)(4). We also agree with the Board's conclusion that, other things being equal, respondent's conduct would necessitate disbarment. We conclude, however, that a remand to the Board is necessary for further proceedings concerning an issue of possible mitigation under our decision in *In re Kersey*, 520 A.2d 321 (D.C.1987).

## I.

Bar Counsel alleged misconduct by respondent in his legal services on behalf of two different clients. One of these clients, Ms. Fannie Grossman, was incompetent to handle her own financial affairs and respondent was appointed her conservator. Because, as the Board recognized, the more serious misconduct occurred in connection with respondent's representation of Ms. Grossman, we shall set forth the facts concerning that conduct in the text and the facts relating to the other charged misconduct in the margin.[2]

The Board summarized the facts of the Grossman matter, which are essentially undisputed, as follows:

Respondent was given control over Ms. Grossman's bank account [in 1979], and thereafter he was responsible for the following transactions:

| Date | Transactions Involving Client's Bank Account |
| --- | --- |
| June 14, 1982 | Respondent withdrew $5,000 without court authorization |
| Aug. 12, 1982 | Respondent redeposited $1,100 |
| Nov. 15, 1983 | Respondent redeposited $3,900 |

Respondent provided no explanation of the above transactions until questioned by the court after he had belatedly filed an annual accounting on January 24, 1984. He was subsequently removed as conservator for "irregularities" in handling his ward's account.

As the Hearing Committee found, the explanation most favorable to Respondent was set forth in proposed factual findings submitted to the Committee by Respondent's counsel. According to this explanation, Respondent withdrew the $5,000 so that he could invest it in a money market fund and earn more interest for his ward. Respondent further contends that immediately after the withdrawal, he changed his mind because he was dissatisfied with the interest rate then available and wanted to "wait" until money market interest rates had reached an even higher level. Therefore, according to Respondent's explanation, he put the $5,000 in his office safe where it allegedly remained while Respondent was waiting for a rise in interest rates. Later, without ever investing the withdrawn sum in a money market fund or

2. Respondent was charged with misconduct in dealing with another client, Charles A. Williams, identified in the record as a person with "significant amounts of cash" derived from "a substantial business in illegal drugs." Shortly after respondent had begun representing Mr. Williams, he received from him a transfer of cash funds of between $6,000 and $10,000. The Hearing Committee found this transfer of cash to be a business loan and that respondent at no time had advised Williams of any potential conflicts or "differing interests" (DR 5–104(A)) arising from his position as borrower and his client's position as lender. The Board, upholding the Hearing Committee's finding that the transaction was a loan and that respondent's client expected him to exercise professional judgment on behalf of the client in such a loan arrangement, concluded that respondent had violated DR 5–104(A) (lawyer may not, absent consent after full disclosure, enter into business transaction with client where two have differing interests and client expects lawyer to exercise professional judgment therein).

Before the Hearing Committee and the Board, respondent argued solely that the transaction was not a loan but rather a partial payment of respondent's fee for legal services on behalf of Mr. Williams. In this court, respondent shifts ground entirely and argues that the transfer was a loan from *Mrs. Williams* of "a portion of her inheritance as a favor [for no] particular reason and not because [respondent] was her husband's attorney." Even were we disposed to consider this argument not made previously, and we are not, *In re James*, 452 A.2d 163, 169 (D.C.1982), we conclude that there is abundant evidence in the record to support the findings of both the Hearing Committee and the Board that the transaction was a loan from Mr. Williams, with whom respondent had an attorney-client relationship, and not from the wife. We therefore conclude that respondent violated DR 5–104(A).

any other type of investment, Respondent dribbled the withdrawn money back into his ward's bank account in two deposits, the second of which was almost a year and a half after the withdrawal.

The Hearing Committee found, and the Board agreed, that this explanation was implausible and unworthy of belief:

> As the Committee observed, *any interest rate*, however low, "would have produced [for respondent's client] a higher yield than the zero percent return" from cash allegedly resting in Respondent's office safe.... It is also noteworthy that Respondent does not even attempt to explain why the funds were returned to his client's account in two separate deposits about 15 months apart. [Emphasis by Board.]

On these facts, the Hearing Committee concluded, and the Board agreed, that respondent had committed the following violations:

—intentional misappropriation constituting dishonesty in violation of DR 1-102(A)(4)

—commingling and misappropriation in violation of DR 9-103(A), because—even accepting respondent's incredible explanation—his client's funds were not "deposited in one or more identifiable bank accounts" as required by DR 9-103(A)

**3.** This last finding was predicated both on the $5,000 withdrawal and on respondent's purchase in 1981 of a Certificate of Deposit for Ms. Grossman's account which he later admitted had been lost, but which he asserted had been replaced with no loss to the ward.

**4.** *In re David Godfrey,* Bar Docket No. 316-87, pending before this court in No. 89-560.

**5.** Misappropriation is any unauthorized use of a client's funds entrusted to an attorney, and does not depend on a showing of improper intent, *In re Harrison,* 461 A.2d 1034, 1036 (D.C.1983). It may include merely "allowing the account balance ... to fall below the amount of ... client's funds in the account." *In re Hessler,* 549 A.2d 700 (D.C.1988).

Respondent argues weakly that his withdrawal of the funds was not "unauthorized"—in the sense that it lacked prior court approval—because the court auditor testified that respondent had authority to withdraw funds to invest in

—failure to maintain complete records of all funds of a client in violation of DR 9-103(B)(3).[3]

## II.

In the present case, as in another recent one,[4] the Board was met with the argument that, although it was clear from the evidence that the attorney had misappropriated client funds,[5] Bar Counsel had failed to prove by clear and convincing evidence what use the attorney had made of the funds and thus that the conduct had been dishonest. *See In re Hessler, supra* note 5, 549 A.2d at 701, *citing In re Hines,* 482 A.2d 378, 380 (D.C.1984) (attorney's reckless disregard for status of accounts gave rise to inference of intent to use funds as his own, and hence dishonesty under DR 1-102(A)(4)). In each of these cases, despite the attorney's obligation under DR 9-103(B)(3) to "maintain complete records of all funds ... of a client," the attorney had kept no accounting of the use of funds.[6] Bar Counsel, in the Board's view, was thus faced with the obstacle

> of tracing virtually untraceable cash funds in order to establish a violation of dishonest misappropriation. If a lawyer inexplicably withdraws funds from his client's account for a non-de minimis period of time, ... does not deposit them into an identifiable account, and holds them, a

money market certificates without obtaining court approval. In fact, the auditor testified that approval was not necessary "to make a transfer" from one kind of bank account to another. This was consistent with DR 9-103(A), which requires that a client's funds "be deposited in one or more identifiable bank accounts...." Thus, even if respondent was not obliged to obtain court approval before withdrawing funds to invest in a certificate of deposit, the withdrawal certainly became unauthorized when he failed to make that investment—or otherwise maintain the funds in a bank account—but instead, accepting his own assertion, kept the funds in his safe for nearly eighteen months presumably commingled with funds of his own.

**6.** "Only by being able to show clearly each and every one of his transactions ... can [the attorney] insure himself of being above reproach." *In re Herr,* 22 N.J. 276, 300, 125 A.2d 706, 719 (1956) (Brennan, J.).

requirement that Bar Counsel trace the funds would impose a difficult and in many cases an impossible burden of proof.

*In re Godfrey, supra* note 4, Board Opinion at 12.

To resolve this difficulty, the Board determined that "[a] rebuttable presumption, shifting the burden of going forward to the party who has the knowledge of what happened to the funds, is just." *Id.* Specifically, the Board adopted and applied in this case a rule that, "whenever a lawyer takes his clients' funds for any non-*de minimis* period of time without authorization and without any proper accounting for them, the law creates a rebuttable presumption that the lawyer has dishonestly misappropriated those funds, whereupon the burden of going forward with explanatory evidence shifts to the lawyer." *In re Thompson*, Bar Docket Nos. 333–84, 499–86, Board Opinion at 9–10.

■ Respondent argues that this rebuttable presumption had the effect of shifting to him the burden of proving his innocence of violating DR 1–102(A)(4), contrary to due process and our decisions. *See In re Williams*, 464 A.2d 115, 119 (D.C.1983) (per curiam) ("The burden of proving the charges rests with Bar Counsel and factual findings must be supported by clear and convincing evidence"); *In re Thorup*, 432 A.2d 1221, 1225 (D.C.1981). The Board was careful in its formulation, however:

> Although the burden of persuasion by clear and convincing evidence remains with Bar Counsel, that burden is met *prima facie* when Bar Counsel, aided by the rebuttable presumption, submits clear and convincing evidence showing an unauthorized taking of client funds with no accounting thereof. The attorney may then come forward with proper explanatory evidence, and if it is credited, the presumption is rebutted.

*In re Thompson, supra*, at 10. Nevertheless, although we find strong justification in our past decisions for consideration of an attorney's explanation (or lack thereof) in determining whether misappropriation has been dishonest, we conclude that it is nei-

ther necessary nor advisable to invoke a formal rebuttable presumption whenever Bar Counsel has proven an unauthorized taking of client funds for a non-*de minimis* period and without a proper accounting. We hold instead that the Board may weigh, together with all of the other evidence, an attorney's explanation for—or conversely inability to explain satisfactorily—the use of a client's funds in deciding whether Bar Counsel has met its burden of proving dishonest misappropriation by clear and convincing evidence.

This rule is consistent with our previous decisions, which repeatedly have looked to the attorney's explanation for use of the client's funds as one factor, but without apparent resort to a burden-shift or presumption in *In re Burka*, 423 A.2d 181 (D.C.1980) (en banc), we sustained a finding by a Hearing Committee, adopted by the Board, that attorney Burka had made numerous unauthorized withdrawals of client funds for his own use, and so engaged in dishonesty, where he offered no explanation of what he had done with the money and Bar Counsel adduced no evidence (at least none cited by the court) tracing the use of the funds. *Id.* at 182–83, 187. Respondent asserts, without elaboration, that the evidence of improper use was "obvious" in *Burka*, but it seems quite as likely that—in addition to the evidence of sustained unauthorized withdrawals—the court took into account the attorney's failure to provide any explanation of his use of the client's funds.

This reliance was made more explicit in *In re Burton*, 472 A.2d 831 (D.C.1984) (per curiam). There the court adopted the Board's opinion and sustained a finding of intentional misappropriation on facts showing that the attorney had placed a sum of money in his client's trust account but wrote numerous unexplained checks that allowed the account balance to fall below the amount owed the intended beneficiaries. Before the Board, Burton argued that "Bar Counsel failed to offer proof concerning precisely how Respondent spent the money he was obligated to hold in the trust account...." *Id.* at 845. The Board

responded that "such information, though potentially relevant, is hardly a necessary predicate to a misappropriation charge." *Id.* The Board rejected respondent's argument—similar to that advanced by respondent here—that the hearing committee had effectively placed the burden of proof on him, and found that Bar Counsel had established a *prima facie* case of knowing misappropriation on the basis of the evidence of the initial deposit and repeated withdrawals depleting the account. *Id.* at 846. Once this occurred,

> Respondent was free to present any evidence or arguments he wished. While Respondent was not obligated to present any defense, neither was Bar Counsel obligated ... to rebut all conceivable defenses and arguments that respondent theoretically might have made, but in fact did not present, to the hearing committee.

*Id.* The Board cited with approval an opinion of the Maryland Court of Appeals, *Attorney Grievance Comm'n v. Boehm*, 293 Md. 476, 479–91, 446 A.2d 52, 54 (1982), which it summarized as follows:

> (Where attorney places auction sale proceeds into escrow account, and bank records reflect withdrawals for unspecified purposes in greater amount than total of proper estate disbursements, court "cannot conceive of any clearer or more convincing evidence of [attorney's] misappropriation of ... funds than that supplied by the escrow account, bank records, *and [the attorney's] failure to explain exactly how these funds were used.*")

*In re Burton, supra,* 472 A.2d at 845 (emphasis added). *See also In re Gilchrist,* 488 A.2d 1354, 1357 (D.C.1985) ("record consisting solely of bank records, bank statements, and canceled checks ... constitutes clear and convincing evidence of misappropriation in the absence of the attor-

ney's explanation of how the funds were used").

These decisions leave little question that Bar Counsel may properly offer the inadequacy (or non-existence) of the attorney's explanation for the use of client funds as one significant—and even decisive—factor in proving dishonest misappropriation. We are, however, disinclined to go further and erect a formal rebuttable presumption that shifts the burden of explanation to the attorney whenever Bar Counsel has proven an unauthorized taking for a non-*de minimis* period and without proper records. In a sense our disagreement with the Board is semantic, for in assigning valid weight to an attorney's failure to explain the use of client funds we undoubtedly invoke something of a presumption, as Chief Justice Vanderbilt recognized decades ago:

> The funds in the hands of an attorney that belong to a client or others must be kept inviolate. For obvious reasons, the strictest rules of conduct apply here and every presumption works against the wrongful user.

*In re Gavel,* 22 N.J. 248, 264, 125 A.2d 696, 704 (1956). But a formal, mandatory rebuttable presumption is, as the Supreme Court has said, a "troublesome evidentiary device," *County Court of Ulster County v. Allen,* 442 U.S. 140, 157, 99 S.Ct. 2213, 2225, 60 L.Ed.2d 777 (1978),[7] which should be invoked only when necessary. The Board took pains to point out that, as intended here, the presumption shifts only the burden of going forward to the attorney, not the burden of proof. Under the Board's own formulation, however, the distinction may be slippery, for the Board states that—upon proof of a *prima facie* case by Bar Counsel—the attorney must come forward with "proper" or "acceptable" explanatory evidence. *In re Thompson, supra,* Board Opinion at 10. If a

**7.** In *In re Godfrey, supra* note 4, Board Opinion at 9 n. 8, the Board expressly opted for a presumption—which, "unless rebutted, requires a conclusion"—instead of a permissive inference in this context because of this court's pronouncements on the importance of preserving the integrity of client funds, which in turn led the Board to conclude "that unrebutted evidence

of dishonest misappropriation should uniformly result in a finding of a violation of DR 1–102(A)(4)." Needless to say, our unwillingness to follow the Board the entire way to adopting a rebuttable presumption does not diminish the importance that this court, and every other, attaches to keeping client funds inviolate.

Hearing Committee finds the attorney's explanation "unacceptable" (either because it is "implausible on its face," *id.* at 11, or carries with it no means of verification), has the attorney failed merely in his burden of going forward, or realistically has he failed to *persuade* the Committee that the funds were used for the benefit of the client and not himself? In these circumstances, a shift in the burden of explanation may blend imperceptibly with a shift in the burden of proof.

We think it prudent, therefore, to limit the significance of an attorney's inadequate or non-existent explanation for use of a client's funds to circumstantial evidence which the Board may consider, along with all the other evidence, in determining whether Bar Counsel has proven dishonesty by clear and convincing evidence. So limited, its consideration is easily justified both by our decisions and by the acute difficulty the Board identified in cases of this sort of "tracing virtually untraceable funds" when the attorney has kept no record of disbursements. As the Board noted, "After cash has been taken without authorization, it becomes fungible and can rarely be traced except through serial numbers which are seldom recorded." *In re Thompson, supra,* Board Opinion at 9. And, as the Board recognized, an attorney's knowledge that inability to explain the use of client funds satisfactorily at a later time will be evidence of dishonesty provides an incentive to the use of trust accounts and proper accounting in the first place. *In re Godfrey, supra* note 4, Board Opinion at 12. We thus have no difficulty in upholding consideration of the adequacy of an attorney's explanation for use of client funds as one factor—and an important one—in the decision whether misappropriation has been intentional.

█ It remains for us to apply this rule to respondent's conduct. As the Hearing Committee and the Board both found, respondent withdrew funds from his client's bank account without authorization and held the funds for nearly a year and a half without any acceptable accounting. He did not maintain the funds intact because he redeposited them in two separate amounts about fifteen months apart, returning the bulk only after he had received repeated notices from the Register of Wills that his required annual report as conservator was overdue. His explanation for the use of the funds was, as the Hearing Committee found, implausible on its face since no possible advantage to the ward could accrue from respondent's leaving the funds in his safe for seventeen months earning no interest. The Board concluded that, taking into account all of the evidence including respondent's unsatisfactory explanation, Bar Counsel established dishonesty by clear and convincing evidence.[8] We adopt that conclusion.

### III.

We turn finally to the question of sanction. In *In re Nicholas Addams,* 579 A.2d 190 (D.C.1990), this court "reaffirm[ed] that in virtually all cases of misappropriation, disbarment will be the only appropriate sanction unless it appears that the misconduct resulted from nothing more than simple negligence." At 191. We stated that, "as a matter of course, the mitigating factors of the usual sort, *see, e.g., In re Reback,* 513 A.2d 226, 233 (D.C.1986) (en banc), will suffice to overcome the presumption of disbarment only if they are especially strong and, where there are aggravating factors, they substantially outweigh any aggravating factors as well." *Id.* at 191.

In the present case, there are no mitigating factors even of the "usual sort" and, as the Board found, a host of aggravating ones. We have sustained the Board's de-

---

8. Respondent argues that this case is on "all fours" with *In re Jones,* 521 A.2d 1119 (D.C. 1986), in which the Board found no dishonesty and we sustained its finding. The facts relied on in *Jones* were quite different, however, including the attorney's explanation for her use of the ward's funds. See *id.* at 1122. It is appar-

ent that the Board was influenced by this explanation, moreover, for it perceived the Hearing Committee (which had found dishonesty) to have relied on the erroneous principle "that a technical conversion *due to sloppy bookkeeping* substantiates this violation [of DR 1–102(A)(4) ]." *Id.* at 1122 (emphasis added).

termination that respondent deliberately misappropriated Ms. Grossman's funds.[9] We have also upheld the finding that respondent violated DR 5-104(A) in his dealings with Mr. Williams. See note 2, *supra.* These violations are not the extent of respondent's proven disciplinary infractions. To the contrary, as the Board pointed out, respondent has a history of violations of the Disciplinary Rules:

> Respondent's initial brush with the disciplinary system occurred several years ago and resulted in an informal admonition for a violation of DR 1-102(A)(5) (failure to appear in court). Later, the court ordered public censure as the discipline for Respondent's several violations of DR 1-102(A)(5) (failure to appear) and DR 6-101(A)(3) (neglect). *In re Thompson*, 478 A.2d 1061 (D.C.1984). The Board's report in this second case noted that Respondent's "repeated" disregard of his ethical obligations "has caused a great deal of disruption in the judicial system." Next, Respondent was suspended for 90 days for violations of DR 1-102(A)(5) (failure to appear), DR 6-101(A)(3) (neglect), and DR 7-104(A)(1) (contacting opposing party known to be represented by counsel). [*In re Thompson*, 492 A.2d 866 (D.C.1985)].

Thus, as the Board concluded, respondent's record of prior discipline shows an extensive pattern of disregard of the ethical requirements of the Code on Professional Responsibility.

Nor did respondent offer anything before the Hearing Committee or the Board in mitigation of his conduct. Under the caption "mitigating circumstances," respondent's proposed findings of fact submitted to the Committee merely asserted, boldly, that "the public need not be protected from the Respondent. If anything, the public needs more attorneys like Respondent," a proposition on which this record casts substantial doubt. Now, however, at the eleventh hour (fifteen days before oral

argument to be exact), respondent has asked the court to remand his case to the Board for further evidentiary proceedings directed to a mitigating condition he never before cited in these disciplinary proceedings: his alleged alcoholism. As explanation for his failure to cite this condition earlier, respondent points only to his "inability to admit the existence of what he thought to be a disgraceful character flaw." We denied respondent's preargument motion to remand.

■ Respondent has filed a similar postargument motion and attached to it an April 10, 1990 report of the Director of the Lawyer Counselling Program of the District of Columbia Bar, a certified drug/alcohol counselor. The Director evaluated respondent at his request in February of this year and concluded that he suffers from an advanced degree of alcoholism which was "at [its] height" during the period from 1975 to 1987 when his misconduct occurred. Specifically, the report states:

> [Respondent] enjoyed a fairly normal drinking pattern until approximately 1974-76 when he began drinking daily, beginning in his office and into the evening hours. During the period between 1974 through and up until his auto accident in 1987,[10] he was a daily drinker and would consume approximately a fifth daily of various alcoholic beverages. At times, he would drink prior to appearing in court in the mornings. His drinking pattern prior to 1987 was maintenance drinking and he has experienced blackouts and withdrawal symptoms.

The report concluded that, although respondent had ceased drinking in 1987, "he has remained at high risk to resume drinking because he has not really addressed his disease of alcoholism." Hence, on the counselor's advice, respondent entered an out-patient treatment program in an area hospital on March 7, 1990, which he was attending at the time of the report.

---

**9.** We likewise sustain the findings and conclusions as to the other violations set out at page 220, *supra.*

**10.** Respondent informed the counselor that he had been involved in an automobile accident in

1987 in circumstances where his son was driving because respondent was too intoxicated to drive and had passed out in the back seat.

Our first inclination is to say this will not do. It cannot be that an attorney may hold in reserve, as it were, a mitigating condition—relating solely to the issue of sanction, not misconduct—during the entire course of disciplinary proceedings and then invoke it only when disbarment virtually stares him in the face. We conclude, nevertheless, that it would be inappropriate at present for this court to pass judgment on respondent's asserted reason for his silence—classic alcohol denial and the shame of admission. It also is unnecessary for the court to do so and still fulfill its duty to protect the public against lawyer misconduct. We shall, instead, remand the case to the Board for consideration of alcoholism as a possible mitigating factor in respondent's case,[11] but on one necessary condition: Respondent shall agree immediately to suspend his practice in the District of Columbia voluntarily pending the outcome of further proceedings before the Board and any additional proceedings before a Hearing Committee that the Board may order. Should respondent accept this condition,[12] the Board shall proceed to consider the issue of alcoholism under the guidelines of *In re Kersey,* 520 A.2d 321 (D.C.1987), and *In re Miller,* 553 A.2d 201 (D.C.1989), and make findings and recommendations to the court; an order of disbarment will await the outcome of those proceedings. Should respondent not accept the condition stated, the Board shall notify us and an order of disbarment will be entered forthwith.

*Remanded.*

---

**11.** We reject respondent's request for a remand for additional testimony concerning the disposition of the funds entrusted to his care in the Grossman case. The remand will be limited only to the issue of mitigation.

**12.** He also must comply with the notification requirements of Rule XI, Sec. 14 of the Rules Governing the Bar of the District of Columbia.