In re J. Lincoln **WOODARD**, Respondent.

**A Member of the Bar of the District of Columbia Court of Appeals.**

**No. 93–BG–452.**

District of Columbia Court of Appeals.

Argued Jan. 5, 1994.

Decided Feb. 3, 1994.

Ross T. Dicker, Asst. Bar Counsel, with whom Leonard H. Becker, Bar Counsel, Washington, DC, was on the brief, for Bar Counsel.

William B. Moffitt, Alexandria, VA, with whom R. Kenneth Mundy, Washington, DC, was on the brief, for respondent.

Before TERRY and FARRELL, Associate Judges, and PRYOR, Senior Judge.

PER CURIAM:

 In *In re Temple*, 596 A.2d 585 (D.C.1991), we held that addiction to prescription drugs lawfully obtained, like alcoholism, can be treated as a mitigating factor in sanctioning an attorney for misconduct. In the present matter, which is before us on the recommendation of the Board on Professional Responsibility that respondent be disbarred, the Board assumed for argument's sake that respondent had established his addiction to prescription drugs at the time of the misconduct in question. The Board agreed with the Hearing Committee, however, that respondent had failed to prove either that the addiction substantially affected his professional conduct or that he was substantially rehabilitated. *See In re Temple*, 596 A.2d at 589–91; *In re Kersey*, 520 A.2d 321, 327 (D.C.1987); D.C.Bar Rule XI, § 13(g).

Respondent makes no challenge to the findings of the Hearing Committee and the Board that he engaged in repeated acts involving reckless misappropriation of client funds, and that ordinarily the proper sanction for this conduct would be disbarment. *See In re Micheel*, 610 A.2d 231, 233 (D.C. 1992) ("there is a presumption of disbarment in all cases involving misappropriation resulting from more than simple negligence"); *In re Addams*, 579 A.2d 190, 191 (D.C.1990) (en banc). Respondent's sole exceptions pertain to the Board's conclusions with regard to causation and rehabilitation. We reject these challenges for the reasons stated by the Board in its comprehensive report, the greater part of which we append hereto.[1] Only two additional observations are necessary.

First, we decline to extend to this case the disposition adopted in *In re Thompson*, 579 A.2d 218 (D.C.1990), where, following receipt of the Board's recommendation of disbar-

ment, we remanded for consideration of alcoholism as a possible mitigating factor conditioned upon the attorney's agreeing to voluntary suspension of his practice in the meantime. *Id.* at 225. Unlike in *Thompson*, the issue of mitigation has been thoroughly explored in this case at both the Hearing Committee and Board levels; indeed, respondent sought a remand from the Board on the precise ground asserted here,[2] and the Board rejected the request for reasons (also recited in its report, *infra*) that we find persuasive.

Second, the Board's report provides sound reasons why the Hearing Committee could properly credit Dr. Ratner's conclusion on the issue of causation over that of respondent's primary expert, Dr. Burbach. In the disciplinary context, as in all others, "It is elementary that a trier of fact may elect to pick and choose which evidence to rely upon." *Attorney Grievance Comm. of Maryland v. Nothstein*, 300 Md. 667, 480 A.2d 807, 816 (1984); *see also In re Micheel*, 610 A.2d at 234 ("The Board is obliged to accept the hearing committee's factual findings if those findings are supported by substantial evidence in the record, viewed as a whole"). While it appeared to the Hearing Committee that "none of the experts who testified knew enough about Respondent," both the Committee and the Board found Dr. Ratner's opinion of no-causation to be more thoroughly substantiated than the opinions of respondent's experts,[3] and confirmed by the active trial practice which respondent carried on during the period of misconduct and assumed addiction.

Accordingly, it is ORDERED that respondent is disbarred from the practice of law in the District of Columbia, effective 30 days from the date hereof. *See* D.C.Bar R. XI, § 14(e). Respondent's attention is called to

---

1. We delete the Board's summary of the evidence establishing the disciplinary violations, inasmuch as respondent does not contest the findings of misconduct.

2. That ground consisted of the assertion, supported by a letter from a newly-retained psychiatrist, that respondent's misconduct stemmed from certain personality disorders rather than—or in combination with—his drug addiction.

3. As the Hearing Committee noted, for example: "Dr. Ratner's review of Respondent's medical records and the pleadings related to this proceeding is contrasted to Dr. Burbach's and Ms. Makepeace's [a substance abuse counselor's] lack of review of such materials and reliance on Respondent's self reports."

the provisions of D.C.Bar Rule XI, §§ 14(f) and 16(c).

*So ordered.*

## APPENDIX

### DISTRICT OF COLUMBIA COURT OF APPEALS

BOARD ON PROFESSIONAL RESPONSIBILITY

In the Matter of J. Lincoln Woodard, Esquire,

Respondent.

Docket Nos. 250–89, et al.

### REPORT AND RECOMMENDATION OF THE BOARD ON PROFESSIONAL RESPONSIBILITY

After eight days of hearings that included the testimony of fourteen witnesses as well as the admission of numerous exhibits, Hearing Committee Number Eight found that Respondent recklessly and carelessly misappropriated the funds of four clients in violation of DR 9–103(A), commingled the funds of four clients in violation of DR 9–103(B)(3), and failed to maintain complete records and render appropriate accounts for two clients in violation of DR 9–103(B)(4).

Respondent admitted misappropriating funds of three clients. He also admitted the charges of commingling of funds, and did not contest the charges of failure to maintain complete records and render appropriate accounts.

Respondent claimed in mitigation of sanction that he was addicted to prescription drugs during the relevant period of time, that his misconduct was substantially caused by that addiction, and that he is now substantially rehabilitated. He urges that the sanction of disbarment be mitigated, and that he be allowed to continue the practice of law under *Kersey*-type conditions.

The Committee, after considering the pertinent lay and expert testimony, rejected the mitigation claim, and recommended that Respondent be disbarred. Bar Counsel agreed with the Hearing Committee. The Board, for the reasons stated herein, agrees with the findings and recommendations of the Hearing Committee.

\* \* \*

### EVIDENCE ON MITIGATION ISSUE

*Respondent's Expert Testimony*

In support of his mitigation claim, Respondent offered the expert testimony of Ms. Susann Makepeace, a counselor to individuals suffering from drug or alcoholic abuse; Dr. Rodney V. Burbach, a board certified psychiatrist, Dr. Amazair McAllister, a family practitioner; and Dr. Linda Berg–Cross, a clinical psychologist.

Ms. Makepeace evaluated Respondent on January 24, 1990. (1/3/91, at 73) Based on a history given by Respondent, Ms. Makepeace ascertained that he had a long-standing problem with drugs and alcohol. (*Id.* at 75) She subsequently spoke to Respondent a few times on the telephone, and saw him once, in March of 1990. (*Id.* at 76). At that time, he "appeared to be committed to his recovery." (*Id.* at 96) She referred him to Dr. Burbach. (*Id.* at 75)

Dr. Burbach first saw Respondent in January of 1991. In Dr. Burbach's opinion, Respondent was a "very sick person." He was "unfocused and disorganized and repetitious." (*Id.* at 199) Dr. Burbach learned that Respondent had suffered from Bells' Palsy, and had undergone surgery in June of 1984. Dr. Burbach concluded that Respondent was addicted to benzodiazepines—Valium, Klonopin, Ativan, and Xanax. (*Id.* at 221) He had Respondent admitted to Suburban Hospital for detoxification. (*Id.* at 224)

Dr. Burbach was informed that, as of January 1990, Respondent's IQ was 88, and was 100 about a year later. He testified that the increase in IQ showed that Respondent "is better, but he has a ways to go." In his opinion, Respondent's IQ must have been "more than a hundred" before his illness. (*Id.* at 225)

It was Dr. Burbach's understanding that Respondent, after leaving Suburban Hospital, continued going to meetings of Alcoholic Anonymous "about three times a week." He

also continued to attend Dr. Burbach's weekly therapy sessions. (*Id.* at 231)

In Dr. Burbach's opinion, the primary cause of Respondent's misconduct was "the drug ingestion and the toxicity." (*Id.* at 249) Dr. Burbach testified that, but for his impairment, Respondent's misconduct would not have occurred. (*Id.* at 256) However, he also testified that he believed Respondent knew he should not "be doing that," *i.e.*, misappropriating clients' funds. (*Id.* at 255)

Dr. Burbach had not read the complaints or the specifications of charges against Respondent, but he said he understood in "sort of a general way" that "there was a problem with bookkeeping and with misappropriation of funds." (*Id.* at 269)

On the issue of rehabilitation, Dr. Burbach stated that "there appears to be a level of impairment that would prevent [Respondent] from functioning as an attorney." Nevertheless, Dr. Burbach believed that Respondent was sufficiently rehabilitated "so that he is not likely to repeat the misconduct of the type" that he "understood Respondent was engaging in ... prior to January of 1990." (*Id.* at 278)

In a later hearing on the issue of rehabilitation, Dr. Burbach testified to his understanding, based on representations of Respondent, that Respondent had been attending Alcoholic Anonymous meetings two or three times a week since February of 1990, whereas, in fact, he had, as of the date of the hearing (October 21, 1991), only been attending meetings for a period of four or five months of a group that met once a week. (10/21/91 at 88, 241) [7]

Dr. Burbach believed it "very important" for Respondent to attend AA meetings two or three times a week. He considered it "indicative of his continuing to get well," (*Id.* at 243), and would be "troubled" if Respondent had misrepresented to him the number of times he had attended AA meetings "because I think AA is a good thing that recovering people ought to do, but also honesty is the hallmark of recovery. Somebody to be explicitly dishonest in an important kind of way would lead me to question the recovery a lot." (*Id.* at 245)

Respondent testified that he attended AA meetings "primarily every Monday when my schedule does not conflict." (*Id.* at 88) Although Dr. Burbach also believed it important that Respondent have an active sponsor in the AA program, Respondent had no sponsor. (*Id.* at 90, 244)

Respondent entered a weekly group therapy session under the supervision of Dr. Burbach after being released from Suburban Hospital as an outpatient. However, he has attended only about 70 percent of the time. (*Id.* at 250) Respondent is receiving no other rehabilitative therapy (*Id.* at 83–97), and has undergone no urine testing for benzodiazepines since September of 1990. (*Id.* at 235)

Dr. McAllister first saw Respondent in April of 1989. He "felt" that Respondent was addicted to Valium. (1/4/91, at 25–26) [8] Based on the history given him by Respondent, Dr. McAllister understood that Respondent had been "taking anywhere from 50 to 120 milligrams of Valium on a daily basis for at least two to three years." (*Id.* at 42)

At the end of 1989, Dr. McAllister recommended that Respondent consult a psychiatrist because he felt that he could not help him overcome his addiction to benzodiazepines. (*Id.* at 29) In Dr. McAllister's opinion, Respondent had been dependent on these drugs "for as much as two years." (*Id.* at 38) Respondent's last visit to Dr. McAllister was in November of 1990. (*Id.* at 27)

Dr. McAllister's testified that Respondent's use of drugs "would have a direct effect on cognitive functioning on any level." (*Id.* at 39)

Dr. Berg–Cross is "an expert in the field of clinical psychology, "in particular the field of intelligence—IQ testing." (10/21/91 at 18) She administered a Weschler Adult Intelligence Scale (WAIS–R) test to Respondent on August 7, 1991 which showed that Respondent had a Full Scale IQ of 123, with a Verbal IQ of 126 and a Performance IQ of 112. (*Id.* at 23)

7. October 21, 1991 hearing.

8. January 4, 1991 transcript.

A Full–Scale IQ of 123 would place the individual tested in the top ten percent of the population. A Verbal IQ of 126 would place the individual tested two standard deviations above the mean. A Verbal IQ score of 130 would place the individual in the top two percent of the population. (*Id.* at 27–28)

Dr. Berg–Cross testified that the increase in Respondent's IQ from August and September of 1990 was "very significant." She explained the increase, "given the history that I know now," by the "results of the effects of the drugs wearing off of him and his regaining levels of former functioning." (*Id.* at 40–41) It was her opinion that, in view of her understanding of the Respondent's addiction and the increase in the IQ, Respondent "is substantially rehabilitated or recovered from his drug abuse." (*Id.* at 66–67)

*Bar Counsel's Expert Testimony*

Bar Counsel offered the testimony of Dr. Richard A. Ratner, a forensic psychiatrist, and Dr. Timothy A. Koltuniak, a clinical psychologist.

Dr. Ratner interviewed Respondent on five occasions between August 14 and December 26, 1990. He also reviewed a considerable amount of material relating to Respondent, and spoke to Dr. Burbach and Dr. Dove (one of Respondent's doctors). Respondent was seen by Dr. Koltuniak at Dr. Ratner's suggestion. (Bar Ex. 56)

Dr. Ratner had difficulty responding to a question as to whether, but for the ingestion of the various drugs, Respondent would have *misappropriated funds* of clients in 1988 because he was not convinced that Respondent was in fact overusing drugs, since there are no prescription records to indicate the quantity of benzodiazepines he was consuming. (2/7/91, at 151) [9] Ultimately, Dr. Ratner was of the opinion that Respondent's misconduct was not caused by excessive use of drugs. (*Id.* at 154–155)

"I do not see the substance abuse as being the intermediate step in the part of this that has to do with the kind of borrowing from Peter to pay Paul, so to speak, or taking from here and doing there and mak-

ing decisions about making deposits in this particular account and, for example, comingling it with something else. I see that as more of a personality disorder, that modus operandi and maybe one got oneself into the kind of trouble where that was the response to the problem. Maybe you got yourself in somewhat by virtue of the substances, but I don't think that all of this behavior can be explained by Valium or benzodiazepines." (*Id.* at 180)

Dr. Ratner concluded in his report:

"Diagnostically, the MCMI–II suggests, on Axis I: Generalized Anxiety Disorder, Dysthymia, and Alcohol Abuse; and on Axis II: Narcissistic, Histrionic and Obsessive–Compulsive Personality Disorders." (Bar Ex. 56)

He testified that Respondent "has some axis one problems, some anxiety and some depression and a personality disorder and that those things together to me are sufficient to explain his behavior, including the beginning of substance abuse; in other words, why he would turn to substances if he has become depressed." (2/7/91, at 183)

Dr. Ratner testified further on the issue of causation: " . . . I don't see any evidence to believe that—even if [Respondent] was using Valium in 1988 excessively or even Xanax, I don't see any reason to believe, other than the complaints against him, other than the issues here, I don't see any other evidence to believe that it was really impairing his functioning." (*Id.* at 255) See also *Id.* at 233–235.

Dr. Ratner had "no reason to doubt that [Respondent] had the capacity to form the intent to defraud throughout the last three years. While substance dependent, he was clearly not in a perpetual state of intoxication or delirium. Much evidence of deliberate and intentional behavior exists, including his ability to carry on at least the trappings of a practice." (Bar. Ex. 56) (See also 2/7/91 at 157, 162)

On the issue of rehabilitation, Dr. Ratner testified that generally these types of personality disorders "don't go away." He believes that Respondent still "is functioning on the

9. February 7, 1991 transcript.

level of a narcissistic personality disorder." (2/7/91, at 184) Dr. Ratner could not "rule out" that Respondent would not again engage in the same misconduct. The basis for Dr. Ratner's opinion was:

"I feel that [Respondent] did not even want to come clean to me, in my opinion, as to these previous events. I felt that he was evasive, that he used rationalization, that he used denial and in the case, for example, of discussing an earlier divorce ..., did not in a sense fall back onto the issue of substance until we had really gone through a whole series of what I think were rationalizations and evasions." (*Id.* at 184–185)

It was Dr. Ratner's opinion that the process of rehabilitation "has been at least somewhat successful. Cognitively, things have improved, though the ultimate degree of improvement cannot be predicated ... The most troubling matter is the rationalization and denial that still seem to be abundantly present." (Bar. Ex. 56)

In September of 1990, Dr. Koltuniak administered three tests to Respondent: WAIS–R, Minnesota Multiphasic Personality Inventory (MMPI), and Million Clinical Multiaxial Inventory–II (MCMI–II).

On the WAIS–R test, Respondent achieved a Verbal IQ of 100, a Performance IQ of 89, for a resulting Full Scale IQ of 95. Those scores showed an improvement over those obtained seven months earlier, when the scores were 92, 85, and 88 respectively. The functional improvement reflected by those scores was minimal in Dr. Koltuniak's opinion. (Bar Ex. 56 B)

The most prominent findings from the MMPI and MCMI–II tests were symptoms of a generalized anxiety disorder and apparently strong propensities for abuse of alcohol and other mood altering substances. His basic personality structure revealed several traits related to an addictive disposition.

It was Dr. Koltuniak's opinion that, in terms of Respondent's ability to practice law, "he will likely require at least interim supervision with some tasks (e.g. those involving sustained attention, complex information processing, numerical calculations)" (*Ibid*) Dr. Koltuniak went on to say that the "current personality findings pertain insofar as [Respondent] posing a possible relapse into drug or alcohol abuse." He "strongly suggested that another relapse-prevention component be included in [Respondent's] follow-up care, in the form of more intensive group therapy." (*Ibid*)

Dr. Koltuniak also suggested at the time of his tests that Respondent be reassessed within four to eight months with a full neuropsychological battery to ascertain any subsequent improvements in his neurological and cognitive functioning. (10/21/91 at 106) It was Dr. Koltuniak's belief that the WAIS–R test is a "rather gross measure of neurological functioning." It is "much like using a ruler when a micrometer is called for." (Id. at 126)

Dr. Koltuniak was unable to say whether the results of Dr. Berg–Cross's WAIS–R tests were a reliable indicator of the state of Respondent's rehabilitation. He stated in a letter to Bar Counsel that Dr. Berg–Cross's conclusions "appear to be based on one false statement regarding WAIS–R, a second subjective proposition, and a general lack of knowledge of [Respondent's] previously measured abilities." (Bar Supp. Ex. 3) In the opinion of Dr. Koltuniak, the significant improvement in the IQ scores, in the absence of "an intensive cognitive rehabilitation program and/or coaching on materials similar in content of the WAIS–R, an improvement of this magnitude defies conventional explanation." (Ibid) In sum, he found the results obtained by Dr. Berg–Cross to be "extremely atypical." (Id. at 118)

It was Dr. Koltuniak's opinion that a psychologist is not in a position to make a statement about rehabilitation based on the WAIS–R test alone. (Id. at 216)

Dr. Koltuniak made a tentative appointment with Respondent to administer a battery of neuropsychological tests. However, Respondent objected to more extensive testing, indicating that he was only interested in repeating the tests administered in September. (*Id.* at 127)

## DISCUSSION

The Board agrees with the Hearing Committee and Bar Counsel that Respondent's acts of misconduct included, among others, reckless and careless misappropriation of funds of four clients in violation of DR 9–103(A). The Court of Appeals held in *In re Addams*, 579 A.2d 190 (D.C.1990) (*en banc* ), that, in the absence of evidence of simple negligence or its equivalent, the appropriate sanction is disbarment. *See* also *In re Micheel*, 610 A.2d 231 (D.C.1992).

In his initial answers to Bar Counsel's specifications of charges, Respondent asserted that he did not "seriously dispute the factual allegations," and admitted to the violation of DR 9–103(A). As an affirmative defense to the charges, Respondent alleged that he was "suffering from addiction to prescribed medication as a result of a serious illness contracted long before the alleged irregularities herein." Respondent further alleged that his physical and mental conditions "were such that he was unable to sufficiently and adequately attend to the requirements of his office and the handling of client's funds." In a later answer, he asserted that "[a]ny misconduct by the Respondent was attributable to addiction to alcohol, prescription medicine and to disability and temporary incapacity due to physical illness and pain."

Respondent maintained throughout the hearing and in post-hearing briefs that his misconduct was substantially caused by his addiction to prescription drugs, and urged that any sanction be mitigated under the rulings of the D.C. Court of Appeals in *In re Kersey*, 520 A.2d 321, 326 (D.C.1987); and *In re Temple*, 596 A.2d 585 (D.C.1991). Respondent also contended that he is substantially rehabilitated.

### Addiction

The Hearing Committee found there is clear and convincing evidence that Respondent was addicted to prescription drugs during the period of his misconduct. Its conclusion was based on the testimony of Dr. McAllister, Ms. Makepeace, and Dr. Burbach.

Dr. Ratner questioned whether Respondent was addicted, noting the absence of prescription records to support such a claim. And, although expressing doubts concerning Respondent's addiction, Bar Counsel did not except to the Hearing Committee's finding.

The Board also questions whether Respondent met his burden of proof on this issue in view of the paucity of documentary evidence and the heavy reliance by Respondent's experts on little else but representations of Respondent. However, the Court need not find that Respondent was not addicted to prescription drugs.

### Causation

Under the rulings in *Kersey* and other such disability cases, in order for the Court to mitigate the sanction of disbarment by imposing probationary conditions, Respondent must establish by a preponderance of the evidence that his misconduct was substantially caused by the addiction. *Matter of Miller*, 553 A.2d 201, 203 (D.C.1989); *In re Temple*, 596 A.2d 585, 590 (D.C.1991).

In determining this question, the Board has considered primarily the testimony and reports of Dr. Burbach and Dr. Ratner. Neither Ms. Makepeace nor Dr. McAllister were asked for their opinions on causation. Dr. Berg–Cross's testimony was directed towards the issue of rehabilitation.

In the view of the Board, Dr. Burbach's opinion on causation is faulted by the fact that he had not read the complaint or the specifications of charges against Respondent, and knew only in a general way that "there was a problem with misappropriation of funds." (1/3/91 at 269) He later stated that his understanding of Respondent's misconduct was "[c]onfusion about bookkeeping, a carelessness, a not caring about whether his obligation to do a careful accounting was kept, and maybe not even caring so much that people were treated fairly." (*Id.* at 255) Other than those vague and inaccurate generalizations, Dr. Burbach gave no basis for his conclusion that "the drug ingestion and the toxicity were the primary causes" of Respondent's misconduct. (*Id.* at 249)

Dr. Ratner, on the other hand, was fully aware of the details of Respondent's misconduct. In discussing the charges with Respondent, he found him to be evasive and

determined to rationalize and obfuscate his actions, claiming that "he let the practice get away from him and others were not properly supervised." (Bar Ex. 56)

Moreover, Dr. Ratner had "no reason to doubt that [Respondent] had the capacity to form the intent to defraud throughout the last three years." (Ibid) (See also 2/7/91 at 157, 162)

The Board finds it of significance that Respondent carried on an active trial practice during the period of his misconduct. He intermingled improper withdrawals of clients' funds with numerous appropriate deposits and withdrawals of funds. He used other funds to restore amounts in escrow accounts. As Dr. Ratner noted, he engaged in "the kind of borrowing from Peter to pay Paul." (2/7/91 at 180) He participated in the incorporation and operation of a real estate and title business, and engaged in a law practice involving numerous clients. His personal and professional conduct contrasted starkly with those of the attorney in *Kersey*. 520 A.2d at 324.

The Board believes that Respondent has failed to prove by a preponderance of the evidence that his misconduct was substantially caused by his addiction to prescription drugs. In fact, the overall evidence establishes that Respondent's misconduct was not substantially caused by his addiction.

*Rehabilitation*

In order for the Court to impose *Kersey*-type probationary conditions in mitigation of disbarment, Respondent must also establish by clear and convincing evidence that he is substantially rehabilitated. *In re Temple*, 596 A.2d 585 (D.C.1991); Rule XI, § 13(g); Board Rule § 11.11(d). The Board believes that Respondent has failed to meet that heavy burden.

Respondent relies primarily on the WAIS–R tests administered by Dr. Berg–Cross to support his contention that he is substantially rehabilitated. Those tests showed that Respondent's IQ scores had increased significantly between September 1990 and August 7, 1991.

Dr. Koltuniak found fault with Dr. Berg–Cross's test methods and results, but, in any event, did not believe that a WAIS–R test was sufficient to establish that Respondent has been rehabilitated. In his view, "a psychologist is not in a position to make a statement about rehabilitation on the basis of the WAIS–R test alone." (10/21/91 at 216) Rather, a full neuropsychological battery of tests should be administered. (*Id.* at 106) Furthermore, Dr. Koltuniak believed that Respondent's improvement reflected by Dr. Berg–Cross's WAIS–R tests "defied conventional explanation in the absence of an intensive cognitive rehabilitation program and/or coaching on materials similar in content of the WAIS–R." (Bar Supp. Ex. 3)

Dr. Burbach believes that Respondent is sufficiently rehabilitated so that it is "not likely" that he would again engage in serious misconduct. However, his testimony was, in the Board's view, undercut by his later concession that he would be "troubled" if Respondent had misrepresented to him, as he did, with respect to his attendance at AA meetings, and his testimony that a dishonest representation on an important matter would lead him to question Respondent's recovery "a lot." (10/21/91 at 245)

Moreover, Respondent's approach to rehabilitation has, at most, been casual. He attends AA meetings when his schedule permits. The same appears to be true with respect to his attendance at Dr. Burbach's therapy sessions. He has undergone no other rehabilitation procedures despite Dr. Koltuniak's strong recommendation that he engage in follow-up care in the form of more intensive group therapy. He has not been tested for benzodiazepines since September of 1990.

Dr. Ratner did not believe that Respondent is substantially rehabilitated. Although Respondent "has been at least somewhat successful," Dr. Ratner concluded that "the most troubling matter is the rationalization and denial that seem to be abundantly present." (Bar. Ex. 56) Dr. Ratner would not "rule out" that Respondent would again engage in the same misconduct. (2/7/91 at 184)

The Board agrees with Dr. Koltuniak's opinion that a WAIS–R test alone is not

sufficient to establish that Respondent has been substantially rehabilitated. We also subscribe to Dr. Koltuniak's belief that the result of the test administered by Dr. Berg–Cross was suspect, and defied "conventional explanation" unless Respondent had undergone intensive rehabilitation (of which there was no evidence) and/or had been coached on materials similar in content to the WAIS–R test.

Even in the absence of Dr. Koltuniak's opinion, the Board would reach the conclusion that Respondent was not substantially rehabilitated based on the testimony of Dr. Burbach and Dr. Ratner.

In sum, it is the opinion of the Board that Respondent has not established by clear and convincing evidence that he is substantially rehabilitated.

## RESPONDENT'S MOTION TO REMAND

On December 18, 1992, Respondent filed a motion with the Board, seeking to have this matter remanded "for adduction of newly developed vital evidence and for reconsideration by the Hearing Committee of its findings and recommended sanction."

Respondent asserted in the motion that he "is prepared to accept a reasonable voluntary temporary suspension of his D.C. license to practice law pending further outcome of this matter by the Hearing Committee."

The motion is based on the contents of a letter signed by Dr. Susan J. Fiester, Medical Director of The Psychiatric Institute of Washington, D.C., who consulted with Respondent for a period of five hours in October of 1992. After reciting the facts relating to Respondent's affliction with Bells' Palsy in 1984, Dr. Fiester's letter continued as follows:

"I believe that Mr. Woodard has not been able to fully accept the disfigurement resulting from his Bells' Palsy, which he experiences as 'damage' and this has had a major detrimental impact on his sense of self and self image.

"Finally, Mr. Woodard appears to have psychological personality traits which have affected his functioning and have contributed to the current difficulties in his professional life. In particular, his narcissism inclines him to believe in the possibility of achieving unrealistic goals and makes it difficult for him to accept his limitations and chart an appropriate, realistic course for his life, both in the professional and in the personal spheres.

"It is my understanding that Mr. Woodard's benzodiazipine addiction was previously presented as constituting the primary factor related to his unethical behavior. However, I feel that psychological and psychiatric factors noted above, including serious difficulties in his interpersonal functioning leading to the failure of three marriages, damage to his self image resulting from his facial paralysis, three episodes of major depressive illness, and personality pathology which makes it difficult for him to set realistic expectations for himself, have also been important contributing factors. I believe that the very limited focus on his addiction as the primary contributing factor to his unethical behavior represents only one facet of a much more complicated picture. I believe Mr. Woodard's unethical professional behavior was the result of a complex diathesis of psychological and psychiatric factors which I have noted above."

"I would also like to add that during my meetings with Mr. Woodard, he has begun to discuss the problems that I have noted in this letter. He is becoming more aware of the nature of these problems and has shown an increased willingness to explore his problems. I plan to pursue this with him in future sessions."

The Board denied Respondent's motion on January 21, 1993. It was the view of the Board that Dr. Fiester's opinion was not different from the opinion of Dr. Ratner relating to Respondent's personality disorders. Respondent did not contend during the hearing or in his post-hearing brief that Respondent's primary problem related to the matters set forth in Dr. Fiester's letter or in Dr. Ratner's testimony. Rather, all of Respondent's expert witnesses testified that he was addicted to prescription drugs, and one of

them, Dr. Burbach, opined that his misconduct was substantially caused by that addiction.

Apparently, after coming up short in the "battle of experts," Respondent located a psychiatrist with a new theory. He now argues that Dr. Burbach, the chief proponent of Respondent's addiction causation theory, was mistaken. We are not persuaded.

Moreover, Dr. Fiester does not provide the basis for a finding that Respondent's misconduct was substantially caused by the psychological and psychiatric factors set forth in her letter. And the letter demonstrates on its face that Respondent is not substantially rehabilitated from those psychological and psychiatric problems. Rather, according to Dr. Fiester, he "is becoming more aware of the nature of those problems, and has shown an increased willingness to explore his problems." Dr. Fiester hopes to pursue this in future sessions.

During oral argument before the Board, reference was made by Respondent's counsel to the motion for remand. The question was asked of counsel whether, if the matter were remanded, Respondent would voluntarily agree to a suspension. Thereafter, Respondent's counsel sent a letter to the Board stating that, if the matter were remanded, "Mr. Woodard would offer his voluntary suspension pending ultimate resolution of these matters by the Court of Appeals."

The Board did not feel it should remand the matter as a matter of policy. Respondent had ample opportunity to present his case, and he tried to do so through highly-experienced and highly-competent counsel. Six experts testified. The issues of causation and rehabilitation were exhaustively considered by an able Hearing Committee. Dr. Fiester's proffered testimony would have no bearing on those issues.

### RECOMMENDATIONS

In view of the foregoing, the Board on Professional Responsibility recommends that Respondent be disbarred, and that a *Kersey* approach not be adopted.

BOARD ON PROFESSIONAL RESPONSIBILITY

By /s/ James C. McKay

Dated: April 8, 1993

All members of the Board on Professional Responsibility concur with this report and recommendation.